# MIDLANTIC NATIONAL BANK v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

No. 84–801.   Argued October 16, 1985—Decided January 27, 1986*

---

*Together with No. 84–805, *O'Neill, Trustee in Bankruptcy of Quanta Resources Corp., Debtor* v. *City of New York et al.,* and *O'Neill, Trustee in Bankruptcy of Quanta Resources Corp., Debtor* v. *New Jersey Department of Environmental Protection,* also on certiorari to the same court.

POWELL, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 507.

*A. Dennis Terrell* argued the cause for petitioner in No. 84–801. With him on the brief was *Kenneth S. Kasper*. *William F. McEnroe* argued the cause for petitioner in No. 84–805. With him on the brief was *Thomas J. O'Neill, pro se.*

*Mary C. Jacobson*, Deputy Attorney General of New Jersey, argued the cause for respondent in No. 84–801. With her on the brief were *Irwin I. Kimmelman*, Attorney Gen-

eral, *James J. Ciancia*, Assistant Attorney General, and *Richard F. Engel* and *Ross A. Lewin*, Deputy Attorneys General. *Robert Hermann*, Solicitor General of New York, argued the cause for respondents in No. 84–805. With him on the brief were *Robert Abrams*, Attorney General, *Nancy Stearns*, *Norman Spiegel*, and *Christopher Keith Hall*, Assistant Attorneys General, *Frederick A. O. Schwarz, Jr.*, and *Leonard Koerner.**

JUSTICE POWELL delivered the opinion of the Court.

These petitions for certiorari, arising out of the same bankruptcy proceeding, present the question whether § 554(a) of the Bankruptcy Code, 11 U. S. C. § 554(a),[1] authorizes a trustee in bankruptcy to abandon property in contravention of state laws or regulations that are reasonably designed to protect the public's health or safety.

## I

Quanta Resources Corporation (Quanta) processed waste oil at two facilities, one in Long Island City, New York, and

*\*Thomas H. Jackson*, pro se, filed a brief as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the United States by *Acting Solicitor General Fried*, *Assistant Attorney General Habicht*, *Deputy Solicitor General Claiborne*, *Kathryn A. Oberly*, and *Dirk D. Snel;* for the State of California by *John K. Van de Kamp*, Attorney General, *Theodora Berger*, Assistant Attorney General, and *Reed Sato*, *Lisa S. Trankley*, and *Craig C. Thompson*, Deputy Attorneys General; and for the State of West Virginia et al. by *Charlie Brown*, Attorney General of West Virginia, *Steven Johnston Knopp*, Assistant Attorney General, *James D. Morris*, and *Howard J. Wein*.

*Ronald A. Zumbrun* and *Robert K. Best* filed a brief for the Pacific Legal Foundation as *amicus curiae*.

[1] Section 554(a) reads:

"After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate."

Technical amendments in the Bankruptcy Amendments and Federal Judgeship Act of 1984 added the words "and benefit" after "value" in § 554(a). Pub. L. 98–353, Tit. III, § 468(a), 98 Stat. 380.

the other in Edgewater, New Jersey. At the Edgewater facility, Quanta handled the oil pursuant to a temporary operating permit issued by the New Jersey Department of Environmental Protection (NJDEP), respondent in No. 84–801. In June 1981, Midlantic National Bank, petitioner in No. 84–801, provided Quanta with a $600,000 loan secured by Quanta's inventory, accounts receivable, and certain equipment. The same month, NJDEP discovered that Quanta had violated a specific prohibition in its operating permit by accepting more than 400,000 gallons of oil contaminated with PCB, a highly toxic carcinogen. NJDEP ordered Quanta to cease operations at Edgewater, and the two began negotiations concerning the cleanup of the Edgewater site. But on October 6, 1981, before the conclusion of negotiations, Quanta filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The next day, NJDEP issued an administrative order requiring Quanta to clean up the site. Quanta's financial condition remained perilous, however, and the following month, it converted the action to a liquidation proceeding under Chapter 7. Thomas J. O'Neill, petitioner in No. 84–805, was appointed trustee in bankruptcy, and subsequently oversaw abandonment of both facilities.

After Quanta filed for bankruptcy, an investigation of the Long Island City facility revealed that Quanta had accepted and stored there over 70,000 gallons of toxic, PCB-contaminated oil in deteriorating and leaking containers. Since the mortgages on that facility's real property exceeded the property's value, the estimated cost of disposing of the waste oil plainly rendered the property a net burden to the estate. After trying without success to sell the Long Island City property for the benefit of Quanta's creditors, the trustee notified the creditors and the Bankruptcy Court for the District of New Jersey that he intended to abandon the property pursuant to § 554(a). No party to the bankruptcy proceeding disputed the trustee's allegation that the site was "burdensome" and of "inconsequential value to the estate" within the meaning of § 554.

The City and the State of New York (collectively New York), respondents in No. 84–805, nevertheless objected, contending that abandonment would threaten the public's health and safety, and would violate state and federal environmental law. New York rested its objection on "public policy" considerations reflected in applicable local laws, and on the requirement of 28 U. S. C. § 959(b) that a trustee "manage and operate" the property of the estate "according to the requirements of the valid laws of the State in which such property is situated." New York asked the Bankruptcy Court to order that the assets of the estate be used to bring the facility into compliance with applicable law. After briefing and argument, the court approved the abandonment, noting that "[t]he City and State are in a better position in every respect than either the Trustee or debtor's creditors to do what needs to be done to protect the public against the dangers posed by the PCB-contaminated facility." The District Court for the District of New Jersey affirmed, and New York appealed to the Court of Appeals for the Third Circuit.

Upon abandonment, the trustee removed the 24-hour guard service and shut down the fire-suppression system. It became necessary for New York to decontaminate the facility, with the exception of the polluted subsoil, at a cost of about $2.5 million.[2]

On April 23, 1983, shortly after the District Court had approved abandonment of the New York site, the trustee gave notice of his intention to abandon the personal property at the Edgewater site, consisting principally of the contaminated oil. The Bankruptcy Court approved the abandonment on May 20, over NJDEP's objection that the estate had

---

[2] The sole issue presented by these petitions is whether a trustee may abandon property under § 554 in contravention of local laws designed to protect the public's health and safety. New York is claiming reimbursement for its expenditures as an administrative expense. That question, however, like the question of the ultimate disposition of the property, is not before us.

sufficient funds to protect the public from the dangers posed by the hazardous waste.[3]

Because the abandonments of the New Jersey and New York facilities presented identical issues, the parties in the New Jersey litigation consented to NJDEP's taking a direct appeal from the Bankruptcy Court to the Court of Appeals pursuant to § 405(c)(1)(B) of the Bankruptcy Act of 1978.

A divided panel of the Court of Appeals for the Third Circuit reversed. *In re Quanta Resources Corp.*, 739 F. 2d 912 (1984); *In re Quanta Resources Corp.*, 739 F. 2d 927 (1984). Although the court found little guidance in the legislative history of § 554, it concluded that Congress had intended to codify the judge-made abandonment practice developed under the previous Bankruptcy Act. Under that law, where state law or general equitable principles protected certain public interests, those interests were not overridden by the judge-made abandonment power. The court also found evidence in other provisions of the Bankruptcy Code that Congress did not intend to pre-empt all state regulation, but only that grounded on policies outweighed by the relevant federal in-

---

[3] The trustee was not required to take even relatively minor steps to reduce imminent danger, such as security fencing, drainage and diking repairs, sealing deteriorating tanks, and removing explosive agents. Moreover, the trustee's abandonment at both sites aggravated already existing dangers by halting security measures that prevented public entry, vandalism, and fire. Joint Appendix in No. 83–5142 (CA3), pp. 11–12 (affidavit of Richard Docyk, Deputy Chief Inspector for N. Y. City Fire Department); *id.*, at 26 (transcript of proceedings before DeVito, J.). The 470,000 gallons of highly toxic and carcinogenic waste oil in unguarded, deteriorating containers "present risks of explosion, fire, contamination of water supplies, destruction of natural resources, and injury, genetic damage, or death through personal contact." Brief for United States as *Amicus Curiae* 4, 23; see Joint Appendix, *supra*, at 17 (70,000 gallons at New York site); Appendix in No. 83–5730 (CA3), p. A7 (400,000 gallons at New Jersey site); *id.*, at A46 (deteriorating containers); Joint Appendix, *supra*, at 11 (deteriorating tanks); *id.*, at 26 (guard service); *id.*, at 12 (risk of fire); *id.*, at 11 (contamination of adjacent areas); *id.*, at 20 (health effects of exposure to PCBs and their derivatives).

terests. Accordingly, the Court of Appeals held that the Bankruptcy Court erred in permitting abandonment, and remanded both cases for further proceedings.[4]

We granted certiorari and consolidated these cases to determine whether the Court of Appeals properly construed § 554, 469 U. S. 1207 (1985). We now affirm.

II

Before the 1978 revisions of the Bankruptcy Code, the trustee's abandonment power had been limited by a judicially developed doctrine intended to protect legitimate state or federal interests. This was made clear by the few relevant cases. In *Ottenheimer* v. *Whitaker*, 198 F. 2d 289 (CA4 1952), the Court of Appeals concluded that a bankruptcy trustee, in liquidating the estate of a barge company, could not abandon several barges when the abandonment would have obstructed a navigable passage in violation of federal law. The court stated:

> "The judge-made [abandonment] rule must give way when it comes into conflict with a statute enacted in order to ensure the safety of navigation; for we are not dealing with a burden imposed upon the bankrupt or his property by contract, but a duty and a burden imposed upon an owner of vessels by an Act of Congress in the public interest." *Id.*, at 290.

In *In re Chicago Rapid Transit Co.*, 129 F. 2d 1 (CA7), cert. denied *sub nom. Chicago Junction R. Co.* v. *Sprague*, 317 U. S. 683 (1942), the Court of Appeals held that the trustee of a debtor transit company could not cease its opera-

---

[4] Judge Gibbons dissented, arguing that § 554 permits abandonment without any exception analogous to that provided to the automatic stay. The dissent further contended that the majority's interpretation of § 554 raised substantial questions under the Takings Clause by potentially destroying the interest of secured creditors, see *United States* v. *Security Industrial Bank*, 459 U. S. 70 (1982), and that the majority had failed to address the important underlying issue of the priority of the States' claims for reimbursement.

tion of a branch railway line when local law required continued operation. While the court did not forbid the trustee to abandon property (*i. e.*, to reject an unexpired lease), it conditioned his actions to ensure compliance with state law. Similarly, in *In re Lewis Jones, Inc.*, 1 BCD 277 (Bkrtcy Ct. ED Pa. 1974), the Bankruptcy Court invoked its equitable power to "safeguard the public interest" by requiring the debtor public utilities to seal underground steam lines before abandoning them.

Thus, when Congress enacted § 554, there were well-recognized restrictions on a trustee's abandonment power. In codifying the judicially developed rule of abandonment, Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and federal laws. The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 266–267 (1979). The Court has followed this rule with particular care in construing the scope of bankruptcy codifications. If Congress wishes to grant the trustee an extraordinary exemption from nonbankruptcy law, "the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt." *Swarts* v. *Hammer*, 194 U. S. 441, 444 (1904); see *Palmer* v. *Massachusetts*, 308 U. S. 79, 85 (1939) ("If this old and familiar power of the states [over local railroad service] was withdrawn when Congress gave district courts bankruptcy powers over railroads, we ought to find language fitting for so drastic a change"). Although these cases do not define for us the exact contours of the trustee's abandonment power, they do make clear that this power was subject to certain restrictions when Congress enacted § 554(a).

502

## III

Neither the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety. As we held last Term when the State of Ohio sought compensation for cleaning the toxic waste site of a bankrupt corporation:

> "Finally, we do not question that anyone in possession of the site—whether it is [the debtor] or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver *or the bankruptcy trustee*—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." *Ohio* v. *Kovacs*, 469 U. S. 274, 285 (1985) (emphasis added).

Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law. Where the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety. *Infra*, at 503–504. One cannot assume that Congress, having placed these limitations upon other aspects of trustees' operations, intended to discard a well-established judicial restriction on the abandonment power. As we held nearly two years ago in the context of the National Labor Relations Act, "the debtor-in-possession is not relieved of all obligations under the [Act] simply by filing a petition for bankruptcy." *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 534 (1984).

The automatic stay provision of the Bankruptcy Code, § 362(a),[5] has been described as "one of the fundamental debtor protections provided by the bankruptcy laws." S. Rep. No. 95–989, p. 54 (1978); H. R. Rep. No. 95–595, p. 340 (1977). Despite the importance of § 362(a) in preserving the debtor's estate, Congress has enacted several categories of exceptions to the stay that allow the Government to commence or continue legal proceedings. For example, § 362(b)(5) permits the Government to enforce "nonmonetary" judgments against a debtor's estate. It is clear from the legislative history that one of the purposes of this exception is to protect public health and safety:

---

[5] Section 362(a) provides:

"(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U. S. C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

"(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

"(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

"(3) any act to obtain possession of property of the estate or of property from the estate;

"(4) any act to create, perfect, or enforce any lien against property of the estate;

"(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

"(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

"(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

"(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor."

"Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection*, consumer protection, *safety, or similar police or regulatory laws*, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay." H. R. Rep. No. 95–595, *supra*, at 343 (emphasis added); S. Rep. No. 95–989, *supra*, at 52 (emphasis added).

Petitioners have suggested that the existence of an express exception to the automatic stay undermines the inference of a similar exception to the abandonment power: had Congress sought to restrict similarly the scope of § 554, it would have enacted similar limiting provisions. This argument, however, fails to acknowledge the differences between the predecessors of §§ 554 and 362. As we have noted, the exceptions to the judicially created abandonment power were firmly established. But in enacting § 362 in 1978, Congress significantly broadened the scope of the automatic stay, see 1 W. Norton, Bankruptcy Law and Practice § 20.03, pp. 5–6 (1981), an expansion that had begun only five years earlier with the adoption of the Bankruptcy Rules in 1973, see *id.*, § 20.02, at 4–5. Between 1973 and 1978, some courts had stretched the expanded automatic stay to foreclose States' efforts to enforce their antipollution laws,[6] and Congress wanted to overrule these interpretations in its 1978 revision. See H. R. Rep. No. 95–595, *supra*, at 174–175. In the face of the greatly increased scope of § 362, it was necessary for Congress to limit this new power expressly.

---

[6] See, *e. g., In re Hillsdale Foundry Co.*, 1 BCD 195 (Bkrtcy Ct. WD Mich. 1974) (action by Michigan Attorney General to enforce State's antipollution laws held subject to automatic stay). The House Report also referred to an unreported case from Texas where a stay prevented the State of Maine from closing down a debtor's plant that was polluting a river in violation of the State's environmental protection laws. H. R. Rep. No. 95–595, pp. 174–175 (1977).

Title 28 U. S. C. § 959(b)[7] provides additional evidence that Congress did not intend for the Bankruptcy Code to preempt all state laws. Section 959(b) commands the trustee to "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State." Petitioners have contended that § 959(b) is relevant only when the trustee is actually operating the business of the debtor, and not when he is liquidating it. Even though § 959(b) does not directly apply to an abandonment under § 554(a) of the Bankruptcy Code—and therefore does not delimit the precise conditions on an abandonment—the section nevertheless supports our conclusion that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers.

## IV

Although the reasons elaborated above suffice for us to conclude that Congress did not intend for the abandonment power to abrogate certain state and local laws, we find additional support for restricting that power in repeated congressional emphasis on its "goal of protecting the environment against toxic pollution." *Chemical Manufacturers Assn., Inc.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 143 (1985). Congress has enacted a Resource Conservation and Recovery Act, 42 U. S. C. §§ 6901–6987, to regulate the treatment, storage, and disposal of hazardous wastes by monitoring wastes from their creation until after their permanent disposal. That Act authorizes the United States to seek judicial or administrative restraint of activities involv-

---

[7] Section 959(b) provides:

"Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

ing hazardous wastes that "may present an imminent and substantial endangerment to health or the environment." 42 U. S. C. § 6973; see also S. Rep. No. 98–284, p. 58 (1983). Congress broadened the scope of the statute and tightened the regulatory restraints in 1984.[8]   In the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by Pub. L. 98–80, § 2(c)(2)(B), Congress established a fund to finance cleanup of some sites and required certain responsible parties to reimburse either the fund or the parties who paid for the cleanup.   The Act also empowers the Federal Government to secure such relief as may be necessary to avert "imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance." 42 U. S. C. § 9606.   In the face of Congress' undisputed concern over the risks of the improper storage and disposal of hazardous and toxic substances, we are unwilling to presume that by enactment of § 554(a), Congress implicitly overturned longstanding restrictions on the common-law abandonment power.

V

In the light of the Bankruptcy trustee's restricted pre-1978 abandonment power and the limited scope of other Bankruptcy Code provisions, we conclude that Congress did not intend for § 554(a) to pre-empt all state and local laws.   The

---

[8] Congress eliminated the small generator exception and subjected many more facilities to the regulations.   Pub. L. 98–616, 98 Stat. 3221, 3248–3272 (codified at 42 U. S. C. § 6921(d) (1982 ed., Supp. III)).   Another provision automatically broadens the Act's coverage by automatically assigning a hazardous rating to substances that the Environmental Protection Agency does not classify by a set deadline.   98 Stat. 3227–3231 (codified at 42 U. S. C. §§ 6924(d), (e), (f)(3), (g)(6) (1982 ed., Supp. III)).   Amended enforcement provisions allow more citizen suits, 98 Stat. 3271–3272 (codified at 42 U. S. C. § 6973 (1982 ed., Supp. III)), and authorize administrative orders or suits to compel "corrective action" after a leak has occurred.   98 Stat. 3257–3258 (codified at 42 U. S. C. § 6928(h) (1982 ed., Supp. III)).

Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.[9] Accordingly, we affirm the judgments of the Court of Appeals for the Third Circuit.

*It is so ordered.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

The Court today concludes that Congress did not intend the abandonment provision of the Bankruptcy Code, 11 U. S. C. § 554(a), to pre-empt "certain state and local laws." In something of a surprise ending, the Court limits the class of laws that can prevent an otherwise authorized abandonment by a trustee to those "reasonably designed to protect the public health or safety from identified hazards." While this limitation reduces somewhat the scope of my disagreement with the result reached, it renders both the *ratio decidendi* and the import of the Court's opinion quite unclear. More important, I remain unconvinced by the Court's arguments supporting state power to bar abandonment. The principal and only independent ground offered—that Congress codified "well-recognized restrictions of a trustee's abandonment power"—is particularly unpersuasive. It rests on a misreading of three pre-Code cases, the elevation of that

---

[9] This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

misreading into a "well-recognized" exception to the abandonment power, and the unsupported assertion that Congress must have meant to codify the exception (or something like it). These specific shortcomings in the Court's analysis, which are addressed in greater detail below, stem at least in part from the Court's failure to discuss even in passing either the nature of abandonment or its role in federal bankruptcy.

Abandonment is "the release from the debtor's estate of property previously included in that estate." 2 W. Norton, Bankruptcy Law and Practice § 39.01 (1984), citing *Brown* v. *O'Keefe*, 300 U. S. 598, 602–603 (1937). Prior to enactment of the Bankruptcy Code in 1978, there was no statutory provision specifically authorizing abandonment in liquidation cases. By analogy to the trustee's statutory power to reject executory contracts, courts had developed a rule permitting the trustee to abandon property that was worthless or not expected to sell for a price sufficiently in excess of encumbrances to offset the costs of administration. 4 L. King, Collier on Bankruptcy ¶ 554.01 (15th ed. 1985) (hereinafter Collier).[1] This judge-made rule served the overriding purpose of bankruptcy liquidation: the expeditious reduction of the debtor's property to money, for equitable distribution to creditors, *Kothe* v. *R. C. Taylor Trust*, 280 U. S. 224, 227 (1930). 4 Collier ¶ 554.01. Forcing the trustee to administer burdensome property would contradict this purpose, slowing the administration of the estate and draining its assets.

---

[1] Under the former Bankruptcy Act, title to the debtor's property vested in the trustee. Abandonment divested the trustee of title and revested it in the debtor. 4 Collier ¶ 554.02[2]. Under the Code, the trustee no longer takes title to the debtor's property, and he is simply divested of control over the property by the abandonment. *Ibid.* Although § 554 does not specify to whom the property is abandoned, the legislative history suggests that it is to the person having a possessory interest in the property. S. Rep. No. 95–989, p. 92 (1978); *Ohio* v. *Kovacs*, 469 U. S. 274, 284–285, n. 12 (1985).

The Bankruptcy Code expressly incorporates the power of abandonment into federal bankruptcy legislation for the first time. The relevant provision bears repeating:

"(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate." 11 U. S. C. § 554(a) (amended 1984).

This language, absolute in its terms, suggests that a trustee's power to abandon is limited only by considerations of the property's value to the estate. It makes no mention of other factors to be balanced or weighed and permits no easy inference that Congress was concerned about state environmental regulations.[2] Indeed, as the Court notes, when Congress *was* so concerned it expressed itself clearly, specifically exempting some environmental injunctions from the automatic stay provisions of § 362 of the Code, 11 U. S. C. §§ 362(b)(4), (5) (1982 ed. and Supp. II). See *Ohio* v. *Kovacs*, 469 U. S. 274 (1985).

Nor does the scant legislative history of § 554 support the Court's interpretation. Nowhere does that legislative his-

---

[2] Last Term in *Ohio* v. *Kovacs*, *supra*, which involved the dischargeability of certain environmental injunctions in bankruptcy, we briefly addressed the abandonment of hazardous waste sites:

"After notice and hearing, the trustee many abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. 11 U. S. C. § 554. Such abandonment is to the person having the possessory interest in the property. S. Rep. No. 95–989, p. 92 (1978). . . . If the site at issue were [the debtor's] property, the trustee would shortly determine whether it was of value to the estate. If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation [the debtor] might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee would likely abandon it to its prior owner, who would have to comply with the state environmental law to the extent of his or its ability." *Id.*, at 284–285, n. 12.

tory suggest that Congress intended to limit the trustee's authority to abandon burdensome property where abandonment might be opposed by those charged with the exercise of state police or regulatory powers.

The Court seeks to turn the seemingly unqualified language and the absence of helpful legislative history to its advantage. Adopting the reasoning of the Court of Appeals, the Court argues that in light of Congress' failure to elaborate, § 554 must have been intended to codify prior "abandonment" case law, and that under prior law "a trustee could not exercise his abandonment power in violation of certain state and federal laws," *ante*, at 501. I disagree. We have previously expressed our unwillingness to read into unqualified statutory language exceptions or limitations based upon legislative history unless that legislative history demonstrates with extraordinary clarity that this was indeed the intent of Congress. *E. g., Garcia* v. *United States*, 469 U. S. 70, 75 (1984). I think that upon analysis the "legislative history" relied upon by the Court here falls far short of this standard.

The Court relies on just three cases for its claimed "established corollary" to the pre-Code abandonment power. A close reading of those cases, however, reveals that none supports the rule announced today. In *Ottenheimer* v. *Whitaker*, 198 F. 2d 289 (CA4 1952), the Court of Appeals held that a trustee could not abandon worthless barges obstructing traffic in Baltimore Harbor when the abandonment would have violated federal law. The Court concluded that the "judge-made rule [of abandonment] must give way" to "an Act of Congress in the public interest." *Id.*, at 290. *Ottenheimer* thus depended on the need to reconcile a conflict between a judicial gloss on the Bankruptcy Act and the commands of another federal statute. We implicitly confirmed the validity of such an approach two Terms ago in *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 523–524 (1984). Here, by contrast, the "conflict" is with the uncertain commands of

state laws that the Court declines to identify.[3]   In addition, the Court of Appeals relied heavily on the fact that the pre-Code law of abandonment was judge-made, which in turn raises the somewhat Delphic inquiry as to whether that court would have decided the case the same way under the present Code.

*In re Lewis Jones, Inc.*, 1 BCD 277 (Bkrtcy Ct. ED Pa. 1974), was a Bankruptcy Court decision concluding that the principle of *Ottenheimer* did not apply because there was no conflicting statute.   But because the right to abandon was based on judge-made law, the court nonetheless found itself free to protect the public interest by requiring a trustee seeking abandonment to first spend funds of the estate to seal manholes and vents in an underground pipe network.   While this case admittedly comes closer to supporting the Court's position than does *Ottenheimer*, it too turns on the judge-made nature of the abandonment power.   Moreover, I do not believe that the isolated decision of a single Bankruptcy Court rises to the level of "established law" that we can fairly assume Congress intended to incorporate.   See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 379–382 (1982).

In *In re Chicago Rapid Transit Co.*, 129 F. 2d 1 (CA7), cert. denied *sub nom. Chicago Junction R. Co.* v. *Sprague*, 317 U. S. 683 (1942), the District Court sitting in bankruptcy had authorized the bankrupt to abandon a lease of a rail line, and a lessor appealed.   The bankrupt did not appeal the District Court's imposition of conditions on the abandonment; the propriety of those conditions thus was not before the

---

[3] The Court finds "additional support" for its restriction of the abandonment power in recent federal statutes concerned with protecting the environment.   If these statutes operated to bar abandonment here—something neither respondents nor the Court suggests—then this might be a different case.   See *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513 (1984). But the statutes do not bar abandonment, and the majority's reference to their obvious concern over the risks of storing hazardous substances is little more than a makeweight.

Court of Appeals, which affirmed the District Court's *authorization* of abandonment. So while there may be dicta in the Court of Appeals' opinion that would support some limitation on the power of abandonment, the holding of the case certainly does not. In short, none of these cases supports the Court's view that § 554(a) contains an implicit exception for "certain state and local laws."

Even assuming these cases stand for the proposition ascribed to them in the Court's opinion, that opinion's brief discussion of the cases, *ante*, at 500–501, certainly does not support the claim that they reflect an "established corollary" to pre-Code abandonment law. Generally speaking, three rather isolated cases do not constitute the sort of settled law that we can fairly assume Congress intended to codify absent some expression of its intent to do so. Perhaps recognizing this, respondents place substantial reliance for their view that the exception was "well settled" on the following statement in the (pre-Code) 14th edition of Collier on Bankruptcy, accompanying a citation to *Ottenheimer* and *Chicago Rapid Transit:* "Recent cases illustrate, however, that the trustee in the exercise of the power to abandon is subject to the application of general regulations of a police nature." 4A J. Moore, Collier on Bankruptcy ¶ 70.42[2], pp. 502–504 (14th ed. 1978); see also *In re Quanta Resources Corp.*, 739 F. 2d 912, 916 (1984) (quoting same language from Collier). Respondents further observe that the section of this treatise addressing abandonment was cited in a note to an early precursor of § 554, § 4–611 of the proposed Bankruptcy Act of 1973, H. R. Doc. No. 93–137, Part II, p. 181, reprinted in A. Resnick & E. Wypyski, 2 Bankruptcy Reform Act of 1978: A Legislative History, Doc. No. 22 (1979). While resourceful, this argument is wholly unpersuasive.

The reference to Collier is not part of the Code's "'legislative history' in any meaningful sense of the term," *Board of Governors, FRS* v. *Dimension Financial Corp.*, *ante*, at 372. And the proposition for which the section in Collier is cited is

not the view that authority for abandonment is qualified by state police power, but instead the much less remarkable proposition that "[t]he concept of abandonment is well recognized in the case law. See 4A Collier ¶ 70.42[3]." In order to divine that the statutory power to abandon in the proposed Code was to be conditioned on compliance with state police power regulations, therefore, a Senator or Congressman would not merely have had to look at the legislative history of the precursor to the Code, but also would have had to read the several-page treatise section cited in that earlier legislative history.

Neither the three cases cited by the Court nor the attenuated reference to the since superseded version of Collier supports the inference that Congress, while writing § 554 in unqualified terms, intended to incorporate so ill-defined and uncertain an exception to the abandonment authority of the trustee. After suggesting that "if Congress intends for legislation to change the interpretation of a judicially created concept" it should do so expressly, *ante*, at 501, the Court concedes that these cases "do not define for us the exact contours of the trustee's abandonment power," *ibid.* The Court never identifies the source from which it draws the "exact contours" ·of the rule it announces today; congressional intent does not appear to be a likely candidate. Congress knew how to draft an exception covering the exercise of "certain" police powers when it wanted to. See 11 U. S. C. §§ 362(b)(4), (5) (1982 ed. and Supp. II); *supra*, at 509. It also knew how to draft a qualified abandonment provision. See § 1170(a)(2) (abandonment of railroad lines permitted only if "consistent with the public interest"). Congress' failure to so qualify § 554 indicates that it intended the relevant inquiry at an abandonment hearing to be limited to whether the property is burdensome and of inconsequential value to the estate.

I find the Court's discussion of 28 U. S. C. § 959(b) somewhat difficult to fathom. After suggesting that § 959(b)

"provides additional evidence" for the self-evident proposition "that Congress did not intend for the Bankruptcy Code to pre-empt all state laws," *ante*, at 505, the Court concedes that the provision "does not *directly* apply to an abandonment under § 554(a) of the Bankruptcy Code," *ibid.* (emphasis added). The precise nature of its *indirect* application, however, is left unclear. Respondents contend that § 959(b) operates to bar abandonment in these cases. Assuming that temporary management or operation of a facility during liquidation is governed by § 959(b), I believe that a trustee's filing of a petition to abandon, as opposed to continued operation of a site pending a decision to abandon, does not constitute "manage[ment]" or "opera[tion]" under that provision. Not only would a contrary reading strain the language of § 959(b), cf. *In re Adelphi Hospital Corp.*, 579 F. 2d 726, 729, n. 6 (CA2 1978) *(per curiam)* (in pre-Code liquidation proceeding trustee "is in no sense a manager of an institution's operations"), it also would create an exception to the abandonment power without a shred of evidence that Congress intended one. As one commentator has noted, § 554(a) "is among the few provisions in the Bankruptcy Code that do not contain explicit exceptions." Note, 85 Colum. L. Rev. 870, 883 (1985). I would not read 28 U. S. C. § 959(b) as creating an implicit exception.

Citing *SEC* v. *United Realty & Improvement Co.*, 310 U. S. 434, 455 (1940), respondents argue that the Bankruptcy Court's equitable powers support the result reached below. I disagree. While the Bankruptcy Court is a court of equity, the Bankruptcy Code "does not authorize freewheeling consideration of every conceivable equity." *Bildisco & Bildisco*, 465 U. S., at 527. The Bankruptcy Court may not, in the exercise of its equitable powers, enforce its view of sound public policy at the expense of the interests the Code is designed to protect. In these cases, it is undisputed that the properties in question were burdensome and of inconsequential value to the estate. Forcing the trustee to expend es-

tate assets to clean up the sites would plainly be contrary to the purposes of the Code.

I fully appreciate the Court's concern that abandonment may "aggravat[e] already existing dangers by halting security measures that preven[t] public entry, vandalism, and fire." *Ante*, at 499, n. 3. But in almost all cases, requiring the trustee to notify the relevant authorities before abandoning will give those authorities adequate opportunity to step in and provide needed security. As the Bankruptcy Court noted in No. 84–805: "The City and State are in a better position in every respect than either the Trustee or debtor's creditors to do what needs to be done to protect the public against the dangers posed by the PCB-contaminated facility." App. to Pet. for Cert. 73a. And requiring notice before abandonment in appropriate cases is perfectly consistent with the Code. It advances the State's interest in protecting the public health and safety, and, unlike the rather uncertain exception to the abandonment power propounded by the Court, at the same time allows for the orderly liquidation and distribution of the estate's assets. Here, of course, the trustee provided such notice and the relevant authorities were afforded an opportunity to take appropriate preventative and remedial measures.

I likewise would not exclude the possibility that there may be a far narrower condition on the abandonment power than that announced by the Court today, such as where abandonment by the trustee itself might create a genuine emergency that the trustee would be uniquely able to guard against. The United States in its brief as *amicus curiae* suggests, for example, that there are limits on the authority of a trustee to abandon dynamite sitting on a furnace in the basement of a schoolhouse. Although I know of no situations in which trustees have sought to abandon dynamite under such circumstances, the narrow exception that I would reserve surely would embrace that situation.

What the Court fails to appreciate is that respondents' interest in these cases lies not just in protecting public health and safety but also in protecting the public fisc. In No. 84–805, before undertaking cleanup efforts, New York unsuccessfully sought from the Bankruptcy Court a first lien on the Long Island City property to the extent of any expenditures it might make to bring the site into compliance with state and local law. New York did not appeal the court's denial of a first lien, and proceeded to clean up the site (except for the contaminated subsoil). It now presses a claim for reimbursement, maintaining that the trustee should not have been allowed to abandon the site. The New Jersey Department of Environmental Protection, in No. 84–801, apparently seeks to undo the abandonment and force the trustee to expend the estate's remaining assets cleaning up the site, thereby reducing the cleanup costs that must ultimately be borne by the State.[4]

The Court states that the "abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm." *Ante*, at 507, n. 9. Because the Court declines to identify those laws that its deems so "reasonably calculated," I can only speculate about its view of respondents' claim that abandonment can be conditioned on a total cleanup. One might assume, however, that since it affirms the judgments below the Court means to adopt respondents' position. The Court of Appeals, as I read its opinions in these cases, apparently would require the trustee to expend all of Quanta's available assets to clean up the sites.[5] But barring abandonment and forcing a cleanup would effectively

---

[4] NJDEP does not contend that the estate, including any assets otherwise subject to Midlantic's secured claim, contains sufficient assets to complete the cleanup.

[5] I would think that this command qualifies, in the words of the Court, as a "conditio[n] on abandonment . . . so onerous as to interfere with the bankruptcy adjudication itself," *ante*, at 507.

place respondents' interest in protecting the public fisc ahead of the claims of other creditors. Congress simply did not intend that § 554 abandonment hearings would be used to establish the priority of particular claims in bankruptcy. While States retain considerable latitude to ensure that priority status is allotted to their cleanup claims, see *Ohio* v. *Kovacs*, 469 U. S., at 285–286 (O'CONNOR, J., concurring), I believe that the Court errs by permitting them to impose conditions on the abandonment power that Congress never contemplated. Accordingly, in each of these cases I would reverse the judgment of the Court of Appeals.