In re EAGLE–PICHER HOLDINGS, INC., et al., Debtors.

No. 05–12601.

United States Bankruptcy Court, S.D. Ohio, Western Division.

June 13, 2006.

Kenneth R. Craycraft, Jr., Stephen D. Lerner, Jeffrey A. Marks, Kim D. Seaton, Trustee Asst U.S. Trustee, Office of the U.S. Trustee, Cincinnati, OH, for Debtors.

## ORDER RE: OBJECTIONS TO CONFIRMATION ON CUSTODIAL TRUST ISSUES

J. VINCENT AUG, JR., Bankruptcy Judge.

This matter is before the Court on the United States of America, on behalf of the Environmental Protection Agency's ("EPA"), supplemental objection to confirmation of the Debtors' joint plan on custodial trust issues (Doc.2053), the Debtors' response (Doc.2094, 2106), and the Official Committee of Unsecured Creditors' joinder to the Debtors' response (Doc.2097). A trial was held on June 1, 2, and 5, 2006.

Also before the Court are the parties' motions in limine (Docs.2098 and 2109). These motions were both DENIED at the start of the trial. The Debtors' motion for an order waiving the length limitation of its brief (Doc.2092) is hereby GRANTED. The Debtors' motion for a hearing on its motion in limine (Doc.2099) is hereby DENIED as MOOT.

The Debtors own sixteen properties with various environmental problems. Initially, the Debtors proposed to simply abandon these properties as burdensome to the estate. This proposal was met with fierce opposition from federal and state environmental regulatory agencies. The Debtors then proposed to transfer the properties to trust entities ("Custodial Trusts") with each Custodial Trust being funded to a level acceptable to the appropriate agencies. Admirably, the parties were able to agree on the amount of funding for all but two sites, one in Urbana, Ohio and the other in Sidney, Ohio.

Thus, the issue before the Court is the adequacy of the Debtors' proposed funding for the two Custodial Trusts for the Ohio sites. The Debtors propose to fund the Urbana Custodial Trust with $45,000 and the Sidney Custodial Trust with $900,000. The EPA proposes an amount of $1,842,720 for the Urbana Custodial Trust and a range of $5,855,256 to $9,330,420 for the Sidney Custodial Trust.

■ Contrary to the Debtors' contention, the issue is not whether the EPA is entitled to an administrative expense claim. Rather, the issue is whether the Debtors have proposed a plan that is forbidden by law. See 11 U.S.C. § 1129(a)(3). The Debtors bear the ultimate burden of proof on this issue. As to the specific issue of whether the Custodial Trusts are adequately funded, the parties differ sharply on the legal standard to be applied. The EPA contends that the funding amounts must allow for the Custodial Trustee to bring each site "into compliance" with state and federal law. See Doc.2053, p. 4–5. The Debtors contend that the EPA must prove that the sites pose an "imminent and identifiable harm to public health and safety." See Doc. 2106, p. 15.

The definitive case is *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 507, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) wherein the Supreme Court held:

a trustee may not abandon property in contravention of a state statute or regu-

lation that is reasonably designed to protect the public health or safety from identified hazards.

The footnote to the holding states:

This exception to the abandonment power ... is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 507, n. 9, 106 S.Ct. 755.

The Supreme Court offered additional guidance by stating:

the Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety.

*Id.* at 507, 106 S.Ct. 755.

*Midlantic* has spawned two lines of cases. One line of cases holds that abandonment is appropriate unless there is a showing of an imminent danger to public health and safety while the other line of cases holds that abandonment is appropriate only upon a showing of full compliance with the applicable environmental laws. *In re Smith–Douglass, Inc.*, 856 F.2d 12, 15 (4th Cir.1988). Thus, it is not surprising that the parties in this case have advanced different legal standards. As our analysis below reveals, under the specific facts of this case, the two standards create a distinction without a difference. Therefore, for the purposes of this decision, we will adopt the EPA's "tougher" full compliance standard.

■ Although the defense of laches is inapplicable against a governmental entity in an action by that entity to enforce a public right or to protect a public interest,

inactivity on the part of a regulatory agency may be relevant to compliance. *See In re Anthony Ferrante & Sons. Inc.*, 119 B.R. 45, 50 (D.N.J.1990)(citing *In re Franklin Signal Corp.*, 65 B.R. 268, 274 (Bankr.D.Minn.1986) and *In re Purco, Inc.*, 76 B.R. 523, 533 (Bankr.W.D.Pa. 1987)("court infers from the [state's] lack of interest that there is no threat to the public health or safety")).

Some courts have also considered whether or not the debtor has any unencumbered assets with which to finance any cleanup work. *See In re MCI, Inc.*, 151 B.R. 103, 107 (E.D.Mich.1992). The parties offered no evidence on this issue, so we are unable to consider this factor.

### I. Urbana

■ The Urbana site is a 2.86 acre area which includes a 15,000 square foot U-shaped area surrounding a city water tower. The U-shaped area was initially used as a borrow pit in 1966 for the construction of a porcelain manufacturing facility known as the Chi–Vit facility. From 1966 until 1976, when an off-site disposal area became available, the borrow pit was used for on-site disposal of Chi–Vit's off-spec metal oxides, raw materials, and general rubbish. The site was eventually covered with topsoil. It is now a lawn. A few bare spots in the grass are visible.

In 1988, Chi–Vit management purchased the Urbana site from the Debtors, except for the U-shaped disposal site. As a part of this transaction, several environmental investigations were performed, including the installation of ten wells for groundwater testing. Dames & Moore performed a phase I investigation in July 1989, a phase II investigation in November 1989, and a phase III investigation in April 1990. ERM–New England performed a supplemental environmental site assessment in September 1992.

The Dames & Moore investigations showed the presence of two volatile organic compounds in the groundwater, including trichloroethylene ("TCE") in excess of the drinking water standards. However, the Dames & Moore report concluded that the source of TCE was from a known TCE plume in the Urbana area and not from the U-shaped disposal site. The ERM–New England report confirmed that the TCE source was off-site.[1] The Dames & Moore investigation also showed arsenic at an "above action" level in one well (MW9) and lead at an "above action" level in a second well (MW6). Both arsenic and lead are defined as hazardous substances. There was much testimony at the trial about the questionable placement of the testing wells and which of the wells were downgradient from the disposal site. Both the Debtors' environmental expert, Gary Vajda, and the EPA's groundwater expert, Michael Starkey, agreed that one well (MW5) was truly downgradient. The test results for this well showed no level of arsenic or lead.

The Dames & Moore and ERM–New England reports discuss the historical use of the borrow pit as a general disposal site for the Chi–Vit facility. The ERM–New England report references a 1988 site assessment of the overall Chi–Vit facility performed by QSource, which included several areas of concern including the "mixing of solvent wastes (less than 30 gallons) with general plant wastes for off-site disposal."

The Debtors' expert, Gary Vajda, opined that the groundwater test results indicated that "nothing was coming out of this fill." His conclusion was further based on the length of time between the closure of the disposal site in 1976 and the groundwater testing done in 1988 which "should have found a problem if one existed."

Mr. Vajda's proposal for the Urbana site includes the removal of the existing groundwater testing wells[2] and a deed restriction to insure the integrity of the soil in the area at a cost of $45,000.

The EPA's environmental expert, John Gulch, expressed his concern that the U-shaped disposal site was a known industrial disposal site for ten years and that there was no specific listing of what went into this site. The EPA's groundwater expert, Michael Starkey, opined that the single groundwater samples taken are insufficient because the industry norm requires quarterly tests performed over a year to obtain measurements throughout a seasonal flow.

Mr. Gulch and Mr. Starkey's collective proposal for the Urbana site includes a site assessment at a cost of $179,520, the removal of hazardous waste, if necessary, at a cost of $1,650,000 and closure of the wells at a cost of $13,200. The EPA was very clear that the need for the removal of hazardous waste would be entirely dependent upon the results from a site assessment.

Our conclusion as to the amount of funding for the Urbana Custodial Trust turns on Ohio EPA's inactivity with regard to the site. *See In re Anthony Ferrante & Sons, Inc.,* 119 B.R. at 50. The three Dames & Moore reports and the ERM–New England reports described above, which discuss the historical use of the U-shaped area as a disposal site and show elevated samples of lead and arsenic in two wells from one sampling event, form the basis of the EPA's concern for the site

---

1. The EPA is not asserting that the U-shaped disposal site is the source of the TCE.

2. The removal of the wells will eliminate the wells as a possible conduit for contamination of the groundwater.

today. These same results were provided to Ohio EPA in approximately 1995 to aid Ohio EPA in its ongoing study of the TCE plume in the Urbana area. Mr. Starkey offered credible[3] testimony at the trial that while Ohio EPA reviewed the reports with a focus on the TCE problem, "nothing stuck out as something that needed to be done immediately."

The only current data regarding this site is the visual observation of the lack of grass in some areas. While the bare areas were described by Mr. Gulch as a "red flag," Mr. Vajda described the bare areas as being near the water tower and resulting from vehicular traffic. We do not think this warrants the scope of work proposed by the EPA.

Accordingly, we conclude that the Debtors' proposal for the Urbana site will bring the site into compliance[4], that the proposed funding of the Urbana Custodial Trust in the amount of $45,000 is sufficient, and that the Debtors have satisfied their burden of proof and not proposed a plan forbidden by law. The EPA's objection is hereby OVERRULED.

## II. Sidney

■ The Sidney site is an 11.7 acre parcel consisting of an upper 3 acre sandfill and a lower 9 acre dumping ground which is heavily wooded. The site adjoins a residential area and the Great Miami River. The site was leased by the Debtors for several years before being purchased by the Debtors in 1988. The 3 acre sandfill consists of spent nontoxic foundry sand, which is not a hazardous substance, that was deposited by the Debtors from 1986 to 2000 as a byproduct of their nearby aluminum casting operation. The Debtors obtained the necessary regulatory permits

from Shelby County, Ohio for the sandfill and samples of the sand were routinely tested. The Debtors received a "final letter" from the county upon closure of the foundry in 2000. There is no evidence that the sandfill at any time was not in compliance with any environmental regulations.

The lower 9 acres has been used as a general public dump for decades. A 1988 site inspection performed in-house by the Debtors relative to their purchase of the property indicates the presence of general rubbish and industrial garbage, including lots of drums (some still containing liquid), vehicles and vehicle parts, lots of metal parts, foam, a tar-like deposit, mattresses, concrete chunks, tires, appliances, safes, culvert pipe, slag, and piles of rubber shoes. Worn trails indicated a fair amount of human activity in the area. Soil samples taken by the Debtors at the time of the 1988 inspection showed elevated levels of arsenic, lead, and chromium, all of which are defined as hazardous substances. The most disturbing test result showed the presence of 28,000 mg/kg of lead in one sample, which is 70 times the action level for that metal.

The Debtors' expert, Gary Vajda, opined that the sandfill posed no environmental problems. He further opined that the 28,000 kg/mg sample was a "clear outlier." He described the lower 9 acres as an "eyesore" that definitely needs to be cleaned up.

Mr. Vajda's proposal for the Sidney site first includes a "housekeeping" removal of the debris from the lower 9 acres and removal and replacement of 700 square yards of soil. He would add six inches of topsoil and grass seed to the upper 3 acre

---

3. On the whole, we found Mr. Starkey's testimony to be clear, thoughtful and very helpful to the Court in its analysis of the scientific evidence.

4. We believe the site is already in compliance.

sandfill. The cost of this remediation work would be $380,000. The remediation would be followed by a site assessment at a cost of $430,000. Including oversight costs and a deed restriction, the total cost of Mr. Vajda's proposal is $900,000. Mr. Vajda's proposal expressly presumes that the results of the site assessment will yield no results that require further action. Mr. Vajda testified that he based his calculations on the expectation that the Sidney property would be "brought through" Ohio's Voluntary Action Program ("VAP"). Any property that successfully goes through the VAP would necessarily, upon conclusion, be in compliance with Ohio's environmental laws.

Mr. Gulch and Mr. Starkey's collective proposal on behalf of the EPA for the Sidney site includes: 1) a site assessment at a total cost of $552,000; 2) addition of soil to the 3 acre sandfill at a cost of $275,000 or hazardous waste removal, if necessary, at a cost of $3,750,780; 3) hazardous waste removal of the lower 9 acres and replacement of 14,520 square yards of topsoil and grass seed at a cost of $4,174,368; 4) long term (up to 29 years) sampling at a cost of $765,000; and 5) perimeter fencing of the site at a cost of $87,000. The total cost of the EPA's proposal is from $5,855,256 to $9,330,420.

Although both Mr. Gulch and Mr. Starkey strenuously opined that a site assessment should occur prior to any remediation work, all three experts agreed that this site requires both a site assessment and some type of clean up activity. All three experts also generally agreed as to the scope of the site assessment. The difference stems from the scope of the cleanup thought to be required.

In short, the Court is being asked to choose between the Debtors' best case scenario and the EPA's worst case scenario (although the EPA cautions that even their estimate is not indicative of a truly worst case scenario). In this regard, we note that were it not for this bankruptcy, the Sidney site would be receiving no attention at all. It is not currently nor has it ever been under an enforcement action.

The Sidney site is a contrast of knowns and unknowns. The "known" is that the lower 9 acres has been used by the general public as a dump for decades. The "unknown" is what has been dumped there and by whom. There are only a few facts in the record from which we can draw certain inferences. First, although the lower 9 acres appears to have been known for decades to the general public as an available dumping ground, is near a residential area, and is frequented by persons on foot, the site has never been referred to the Ohio EPA as a potential deposit of hazardous waste that warrants an investigation. The inference we draw is that it is more likely than not that most of the dumped material on the site is simply garbage and is not hazardous waste. Second, the site appears to be a place of surface dumpings as opposed to subsurface waste burial. The inference we draw is that this is easier material to clean up and that it will not require as much topsoil removal and replacement as estimated by the EPA. Third, although we think it is far from laudable that the Debtors never cleaned up this eyesore on their own accord, we infer that the Debtors would not have purchased this property in 1988 if they believed they were purchasing 9 acres of hazardous waste.

For all these reasons, we believe the preponderance of the evidence points to the Debtors' best case proposal as the most appropriate. To temper this decision, we think it also appropriate to add a 20% contingency to the Debtors' total

$900,000 proposal amount.[5] Although Mr. Vajda did not include a contingency in his proposal, he testified that it was the industry norm to include a contingency at a range from 5 to 20%. If the 20% contingency proves to be improvidently high, any overage will be returned to the unsecured creditors under the framework of the Custodial Trusts. We do not concern ourselves with the question of whether the site assessment should precede the remediation work as it appears that this decision is more appropriately to be made by the Custodial Trustee.

Accordingly, we conclude that the Debtors' proposal for the Sidney site with an added 20% contingency fee will bring the site into compliance, that the funding of the Sidney Custodial Trust in the increased amount of $1,080,000 is sufficient, and that with the addition of said contingency amount, the Debtors will have satisfied their burden of proof and not proposed a plan forbidden by law. The EPA's objection is hereby OVERRULED in PART and GRANTED in PART.

IT IS SO ORDERED.

---

5. Contingencies can arise in both site assessments and remediation work.