548 A.2d 1224

## In re HARMAR COAL COMPANY.

**Appeal of Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William Miller, William B. Jordan and Paul R. Dean, as Trustees of the United Mine Workers of America 1950 Pension Plan, 1950 Benefit Plan, 1974 Pension Plan, and 1974 Benefit Plan, Collectively Known as the UMWA Health and Retirement Funds.**

Superior Court of Pennsylvania.

Argued May 5, 1988.

Filed Sept. 2, 1988.

Reargument Denied Oct. 31, 1988.

328

Michael D. Bedrin, Pittsburgh, for amicus curiae, Com. of Pa., Dept. of Environmental Resources.

Thomas M. Zwilling and Edwin J. Strassburger, Pittsburgh, for H. Yale Gutnick, Receiver and Harmar Coal Co.

Jeffrey T. Morris, Pittsburgh, for appellants.

Before CIRILLO, President Judge, and BECK and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the order of the Court of Common Pleas of Allegheny County denying a petition to compel partial distribution of assets by the appellants, Trustees of the United Mine Workers Association Health and Retirement Funds.[1] We affirm in a case of first impression.

The facts are not in dispute and reveal that a complaint in equity was filed by Consolidated Coal Company, one of the two shareholders in Harmar Coal Company (Harmar), on April 29, 1985, seeking the appointment of a receiver to wind-up the affairs of Harmar pursuant to the applicable Pennsylvania Business Corporation Law, 15 P.S. § 1001 *et seq.* By order dated May 3, 1985, a receiver was named, and he began the task of liquidating Harmar's assets and running the business until it was completed.

It was not until the receiver had presented his third partial accounting for approval to the lower court that the Trustees, in August of 1987, filed a Motion to Compel Partial Distribution of Funds pursuant to Pennsylvania Rule of Civil Procedure 1534(c), which provides in pertinent part that:

> The court at any time may order a partial distribution of money or property in settlement of claims....

Objections to the Motion were filed by the receiver, the Pennsylvania Department of Environmental Resources (DER) and Harmar Township. After oral argument, and in consideration of the Stipulation of Facts and other filings, the lower court denied the Trustees' Motion (for unpaid contributions due the Funds pursuant to a collective bargaining agreement to which Harmar was a signator) as a general unsecured pre-receivership claim, not entitled to preference in payment. The lower court further concluded that the expenses incurred by the receiver, in attempting to comply with the environmental laws of Pennsylvania, were

---

1. Joseph P. Connors, Sr., Donald E. Pierce, Jr., William Miller, William B. Jordan and Paul R. Dean are the named trustees of the United Mine Workers of America 1950 Pension Plan, 1950 Benefit Plan, 1974 Pension Plan and 1974 Benefit Plan, collectively known as the United Mine Workers Association Health and Retirement Funds.

entitled to an administrative expense status, and, as such, took priority over the claim of the Trustees. This appeal followed.

The Trustees raise three (3) issues for our consideration which, when synthesized, center upon whether the cost of environmental clean-up by the receiver, on behalf of Harmar, is entitled to priority status as an administrative expense.

■ All parties agree that the issue at hand has yet to be decided by an appellate court in this Commonwealth. However, before addressing the merits of the issue raised, we find it necessary to determine whether the order appealed is a final one for appellate purposes. This is so despite the fact that no one challenges the appealability of the order in question, a matter into which we have the authority to inquire *sua sponte. See Turner v. May Corp.*, 285 Pa.Super. 241, 245 n. 2, 427 A.2d 203, 204 n. 2 (1981).

■ Although one may argue that the Trustees, being listed as creditors of Harmar, have a protected right to receive reimbursement for the monies claimed, the fact remains that the expenditures made and to be made by the receiver, to remedy the environmental faux pas by Harmar, will deplete, or even entirely consume, whatever funds are at the receiver's disposal for distribution to creditors.

In this sense, whether priority is to be accorded the Trustees' claim is a right too important to be denied review until Consolidated Coal Company's complaint in equity, seeking a winding-up of the business affairs of Harmar, has run its procedural course. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–547, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528 (1949); *Bell v. Beneficial Consumer Discount Co.*, 465 Pa. 225, 228, 348 A.2d 734, 735 (1975). To wait for such a point in the winding-up process to permit an appeal would require one to face, as noted by the Trustees at page 8 of their brief, "the likelihood that the remaining funds held by [the receiver] would be dissipated

if a partial distribution w[ere] not ordered."[2] We see no need to do so in the case at bar, and, thus, we find the order appealed final since it places the Trustees out of court as to their request for a partial distribution of Harmar's assets, and to require the litigant to await the completion of the winding-up process to lodge any complaints to whatever distribution may be forthcoming jeopardizes one's right to receive the maximum amount possible under the law. *See Cohen,* supra; *Bell,* supra.

 Having determined that the order at bar is subject to appellate scrutiny at this time, we turn to the resolution of whether the cost of environmental clean-up efforts is entitled to priority status as an administrative expense in a state dissolution proceeding.

The lack of any clear direction in this jurisdiction as to the issue posed necessitates our review of various federal decisions to aid us in making our ruling. But, before doing so, we note the precarious situation facing this Court. For example, on the one hand, we have a state-created business corporation law which regulates the orderly dissolution of a company so as to assure, to the greatest extent possible, that any monies owed to creditors of the faltering company are paid. On the other hand, we have the environmental policies of Pennsylvania dictating the preservation and protection of natural resources by those within its borders and to require rectification of any damages to the environment by those responsible. The tension exerted by these two competing forces is evident on the occasion where the costs of reclamation and indebtedness exceed the assets available.

In the bankruptcy field we find a fertile area from which we may glean guidance in resolving the case instantly.

In *Penn Terra Ltd. v. Dept. of Environmental Resources,* 733 F.2d 267 (3d Cir.1984), the Penn Terra mining

**2.** No one disputes the contention of the Trustees in their brief at pages 10–11 that a fund which exceeded $600,000.00 as of the third partial accounting, had dwindled to approximately $500,000.00 at the time of the presentation of the Trustees' Motion to Compel Partial Distribution.

operation was cited by the DER for violation of various state environmental protection statutes. Penn Terra entered into a consent order and agreed to rectify the infractions. However, instead of correcting the problems, Penn Terra filed for bankruptcy under Chapter 7 of the Bankruptcy Code—its debts ($660,000.00) exceeded its worth ($14,000.00).

After the DER obtained a preliminary injunction from Commonwealth Court against Penn Terra to correct the violations, Penn Terra filed a petition for contempt in bankruptcy court against the DER for violating the automatic stay provision of 11 U.S.C. § 362(a) by seeking a preliminary injunction. On appeal, the Third Circuit Court of Appeals reversed the bankruptcy and district courts' rulings enjoining the DER from acting to force Penn Terra to remedy the environmental problems.

The *Penn Terra* Court, albeit not explicitly giving preference to state environmental laws calling for a debtor's reclamation of land over the bankrupt's creditors, impliedly sanctioned the priority to be accorded to a state's efforts in remedying environmental hazards and the accountability for the restoration of the same by a bankrupt. In this regard, the Court wrote:

> ... it first is clear to us that the actions taken by DER in obtaining and attempting to enforce the Commonwealth Court's injunction falls squarely within Pennsylvania's police and regulatory powers. DER seeks to force Penn Terra to rectify harmful environmental hazards. No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined. Indeed, both the Senate and the House committee reports on the Bankruptcy Reform Act explicitly acknowledge environmental protection as a part of the State's police power.

733 F.2d at 274 (Footnote omitted). Further, and more importantly, the Court noted that the preservation of the

corpus of the debtor's estate is not paramount when the rehabilitation of the environment is at stake. *Id.* at 278.

Even more to the point is the case of *In re Laurinburg Oil Co.*, 49 B.R. 652 (Bkrtcy.D.N.C.1984), wherein the Bankruptcy Court was requested to decide whether the reasonable and necessary expenses to abate violations of North Carolina environmental pollution laws at a waste disposal facility could be classified as administrative expenses necessary to preserve the debtor's estate pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1). The Court did so hold in concluding that requiring the debtor to restore its waste disposal facility to a condition in which it would no longer constitute a public nuisance was a proper means by which to achieve the State's objective of "prevent[ing] further deterioration of the property and ... enhanc[ing] its economic worth in the future." 49 B.R. at 654.

Moreover, the concern of the judiciary in taking steps to prohibit a trustee, of a hazardous waste disposal company, from abandoning the situs of the problem in the face of state and federal environmental laws was exemplified by *Midlantic National v. New Jersey Dept.*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

The Court in *Midlantic* refused to adopt a position which would have allowed a trustee in bankruptcy to exercise its power to "abandon" property under 11 U.S.C. § 554(a) because it posed dangers as a result of hazardous waste stored on the premises. As the United States Supreme Court worded it:

Neither the Court nor Congress has granted the trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety. As we held last Term when the State of Ohio sought compensation for cleaning the toxic waste site of a bankrupt corporation:

"Finally, we do not question that anyone in possession of the site—whether it is [the debtor] or another in the

event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver *or the bankruptcy trustee*—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." *Ohio v. Kovacs,* 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) (emphasis added).

\* \* \* \* \* \*

... Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety.

106 S.Ct. at 760 (Citation omitted).

The Court went on to observe that Congress did not intend for the Bankruptcy Code to pre-empt state laws by enacting 28 U.S.C. § 959(b), which provides in pertinent part that a trustee must "manage and operate the property in his possession ... according to the requirements of the valid laws of the State." The Court took pains to emphasize its and Congress' endorsement of a "goal of protecting the environment against toxic pollution", *see Chemical Manufacturers Association, Inc. v. National Resources Defense Council, Inc.,* 470 U.S. 116, 143, 105 S.Ct. 1102, 1117, 84 L.Ed.2d 90 (1985), by rebutting the trustee's argument that § 959(b) only applied to the "operations" phase of a business under receivership and not when it was being "liquidated", as was the case there. Despite conceding the trustee's assertion, the Court found § 959(b) to support its conclusion that Congress did not intend the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of the trustee's powers, especially when it came to averting endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance.

Thus, the public health and safety took precedence over a trustee's abandonment powers, with the absorption of the cost to neutralize the hazard being placed with the estate under receivership. *See also In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987), wherein the Court re-affirmed *Midlantic's* position that the violation of a hazardous waste statute by a company involved the public's health and safety, such that the appointment of a trustee in bankruptcy did not relieve either the bankrupt or its trustee from accountability for failure to correct the violation(s).

Since the State of Tennessee had to remedy the environmental health hazard at public expense, it was entitled to reimbursement. The Court in *In re Wall Tube* found "... those expenses to be actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public." 831 F.2d at 124. The overriding consideration weighing on its decision was the Court's detection in "the *Midlantic* and [*Midlantic, Ohio v.* ] *Kovacs* [, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985),] cases ... [of the] creat[ion of] a special emphasis on the importance of complying with laws that protect public health and safety." *Id.* at 123.

Instantly, as noted most appropriately by Amicus Curiae [3] in its brief to us, with the discontinuance of operations by Harmar in May of 1985, no provisions were made for the long-term maintenance and treatment of mine water, nor was there implemented any approved mine closure and reclamation plan. Any approved plan would require, as written by Amicus Curiae at page 7 of its brief:

> ... at a minimum, the sealing and closure of all mine entires, boreholes, slopes, shafts, tunnels, removal and reclamation of all surface structures and buildings and provision for the long term pumping, treatment and/or

---

**3.** Amicus Curiae is the Commonwealth of Pennsylvania, Department of Environmental Resources, whose brief we found very informative and helpful in reaching our decision.

abatement of any post-mining discharge. (R. 77a, 91a, 92a).

Further, Amicus points out:

Today, the Harmar Mine is the source of at least five (5) uncontrolled and untreated discharges of acid mine drainage. * * * At this time, these discharges are flowing at the aggregate rate of more than 1 million gallons per day, which is up from approximately 300,000 gallons per day in August, 1987. If pumping does not soon begin, this flow could increase to as much as four million gallons per day.

The discharges are pollutional in nature in that they have chemical characteristics indicative of acid mine drainage and do not meet the effluent limitations set forth in Harmar's NPDES Permit or the Department's Regulations. (R. 108a, 109a, 116a–118a). The discharges have caused, and are continuing to add, pollution to Guys Run and the Harmar Harbor of the Allegheny River, causing degradation therein, and posing a hazard to public health, safety and welfare. (R. 88a, 92a, 93a, 101a). Several public water supply intakes, including those used by Fox Chapel Water Authority, the Wilkinsburg–Penn Joint Water Authority, the City of Pittsburgh, and the Borough of Millvale, are located downstream of the area where the discharges from the Harmar Mine enter the Allegheny River. (R. 109a). In addition, the discharges are seriously jeopardizing valuable fish and aquatic communities, including spawning grounds, found in the Harmar Harbor. (R. 109a).

(Brief at 8 & 9; footnote omitted)

From our review of the facts, we find that the receiver, as directed by the court below, was to comply with this Commonwealth's laws in carrying out his obligations to wind-up the affairs of Harmar. This encompassed the abatement of unlawful nuisances and hazards to the health and safety of the citizenry of Pennsylvania. See *Midlantic*,

supra; *In re Wall Tube & Metal Products Co.*, supra. Such is quite evident from the host of environmental laws promulgated by the Legislature in this Commonwealth to protect the interests of the people and the preservation of the natural resources within the boundaries of this jurisdiction.[4]

The protestations of the Trustees that the hazards on the Harmar property existed prior to the appointment of the receiver and, therefore, should not be given status as a post-receivership administrative expense, along with the other creditors in existence, are unpersuasive.

The law is quite clear that the health and safety of the public is of paramount concern and will take precedence over those of a debtor's creditors; otherwise the remedial measures necessary to ameliorate a situation involving reclamation of land and hazardous waste would have to be shouldered by the public instead of the profit-oriented entity or person now placed into the hands of a receiver. *See generally Midlantic*, supra.

The reclamation and water pollutant problems were extant at the time the receiver was appointed, and, as such, it was his obligation, under pain of state law, to rectify and bring into compliance Harmar's non-compliance with environmental legislation. In this sense, the receiver would be "preserving" the estate. And, consequently, such costs of preserving the estate are entitled to administrative expense priority. *See In re Wall Tube & Metal Products Co.*,

**4.** Illustrative of this comprehensive program of environmental protection are the following statutes, each designed to address a particular area of concern: The Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. § 691.1 *et seq.* (Clean Streams Law—Water Pollution); The Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. § 1396.1 *et seq.* (Surface Mining Conservation and Reclamation Act—Surface Mining); The Act of January 8, 1960, P.L. 2119, *as amended*, 35 P.S. § 4001 *et seq.* (Pennsylvania Air Pollution Control Act—Air Pollution); The Act of July 7, 1980, P.L. 380, No. 97, 35 P.S. § 6018.101 *et seq.* (Pennsylvania Solid Waste Management Act—Solid Waste); The Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 510–17 (The Administrative Code of 1929—Abatement of Nuisances).

supra; *In re Laurinburg Oil Co.*, supra; *but see In re Pierce Coal and Construction, Inc.*, 65 B.R. 512 (Bkrtcy. S.D. Ohio 1986).

■ Lastly, as for the Trustees' contention that its claim against Harmar is entitled to priority treatment as a wage claim under the Pennsylvania wage statute, 43 P.S. § 221, and should not have been characterized by the lower court as a purely general unsecured claim having no priority, we find the same to be meritless. The remarks of the appellee/receiver are appropriate in responding to the Trustees' contention; to-wit:

The Harmar Mine was placed on stand-by status on May 31, 1980. Subsequent to May 31, 1980, there were no wages earned by UMW members in conjunction with Harmar. Harmar did not become involved in receivership proceedings until May 3, 1985. The Pennsylvania Wage Act cited by and relied on by Appellants clearly provides in relevant part that:

"All moneys that may be due or hereafter become due for labor and services rendered by any miner or merchant ... for any period not exceeding six months preceding the sale or transfer of the real or personal property ... by execution or otherwise, on account of the death or insolvency of such employer ... provided however, that the claim thus preferred shall not exceed two hundred dollars ..."

43 P.S. § 221.

The facts of this case clearly [d]o not fall within the restrictions of the Wage Act. The property was sold subsequent to May 31, 1985 and the Trustees cannot point to any facts showing wages earned within six (6) months prior to the sale.

(Receiver's Brief at 12) We agree and, thus, affirm the order of the court below.

ORDER AFFIRMED.