## In re WHITE CRANE TRADING COMPANY, INC., Debtor.

**Bankruptcy No. 93–21270–C–7.**

United States Bankruptcy Court, E.D. California.

June 14, 1994.

---

Mark Serlin, Flaherty & Serlin, Sacramento, CA, for Chapter 11 Trustee.

Christopher Ames, Deputy Atty. Gen., Dept. of Justice, State of CA, San Francisco, CA, for the State of Cal.

Mark Gorton,[1] McDonough, Holland & Allen, Sacramento, CA, Howard A. Gordon, Gordon and Associates, P.C., West Hartford, CT, for Planned Sales Promotions, Inc.

## MEMORANDUM DECISION

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

This motion seeks to revoke an order entered in this case authorizing a sale, variously termed "Chapter 11 Sale" or "Bankruptcy Sale" or "Cash Raising Sale", to be conducted on the premises of the debtor furniture retailer.

The controlling question is whether Judicial Code § 959(b), 28 U.S.C. § 959(b), prevents merchants from using bankruptcy as a screen for conducting financial distress sales of indefinite duration in a manner inconsistent with state consumer protection or deceptive trade practice laws.

A merchant operating as a liquidator has established a nationwide business of running financial distress sales, advertised as "Chapter 11 Sale" or "Bankruptcy Sale" or "Cash Raising Sale", for furniture stores. The merchant fends off local authorities by telling them that the Supremacy Clause prevents them from enforcing consumer protection and deceptive trade practice laws that prohibit false and misleading advertising.

■ I conclude that the mandate of section 959(b) requiring the trustee and debtor in possession to operate the debtor's business according to the requirements of the valid laws of the state in which such property is situated prohibits the use of bankruptcy as a ruse to circumvent applicable state consumer protection laws by those who continue to operate in the marketplace. Accordingly, the motion to revoke brought by the subsequently-appointed bankruptcy trustee, and joined in by the California Attorney General, will be granted.[2]

## FACTS

White Crane Trading Company ("White Crane") began retail furniture operations in September 1992, claiming relation to the Levitz furniture chain. It commenced this bankruptcy case by filing a chapter 11 petition on February 12, 1993, scheduling $342,-366.71 in inventory and $779,949.97 in unsecured debt and unpaid sales and employment taxes.

Seven days after commencing the case, White Crane, as debtor in possession, filed a motion for authority to enter into a postpetition "Bankruptcy/Liquidation Sale Agreement" with Planned Sales Promotions ("PSP"), a creature animated by Eugene Rosenberg and Gene Rosenberg Associates ("Rosenberg"). Under the agreement, PSP would conduct an on-going "cash raising" liquidation sale in which PSP would introduce and sell its own furniture in addition to, and in greater quantities than,[3] the debtor's furniture. The sale would be authorized to last for 180 days and could be extended upon agreement.[4] PSP would receive 10 percent

---

1. In the interest of preserving reputations, this counsel was not brought into the case until after the events that are the subject of this decision occurred.

2. After this motion was decided with unpublished findings and conclusions, the California Attorney General asked that the analysis be published on the grounds that there is a paucity of precedent on the question and that the analysis would be of interest to consumer protection agencies nationwide, to the Federal Trade Commission, and the bankruptcy bench and bar. The request was in writing, was served on the contesting parties, and elicited no objections. This Memorandum Decision has accordingly been prepared preserving the legal analysis but, in the interests of clarity and economy, setting out only factual matters that are essential to an under-

standing of this decision. The controlling factual findings remain the Findings Of Fact And Conclusions Of Law On Motion To Revoke Order Authorizing Sale filed December 30, 1993.

3. More than 70 percent of the furniture sold during the sale was new inventory introduced by PSP.

4. The pertinent language of the proposed contract:

 [T]he Sale may be conducted at the Premises for up to 180 days pursuant to the terms of this agreement, subject to further extension without notice to any party upon consent of Debtor or any successor trustee of Debtor, plus the consent of any Official Creditor's Committee, and upon a further order of the Court.
 Proposed Agreement at 5.

of the gross sales of White Crane's inventory and PSP's sales personnel would receive an additional 5 or 6 percent. Net profits from sales of PSP's inventory, after commissions and operating expenses, would be split between PSP and the debtor. The movants said that their goal was to raise the capital necessary for the debtor to remain in the retail furniture business and propose a plan of reorganization.

The creditor's committee and the United States trustee supported the sale after PSP agreed to increase the debtor's share of the net profits. Nobody objected. The motion was granted subject to court-imposed conditions.

The first condition was the deletion of a proposed provision that would have authorized PSP to "conduct the Sale in the manner described herein without the necessity of complying with any federal, state, or local statute or ordinance regarding any licensing and/or permit requirements" that might otherwise apply. I refused to place judicial imprimatur on such a provision, expressing doubt about whether any such provision would be enforceable in light of section 959(b). Professing an intention to comply with otherwise applicable law, the parties deleted the provision.

The second condition related to proposed terms under which PSP would "be permitted to use names, phrases and concepts on all advertising, and at the Sale Location, like 'Bankruptcy Sale', 'Final Sale Days', and 'Going out of Business'" with the proviso that "the use of 'Going out of Business' type phrases shall only be permitted if the proceeding becomes a liquidating chapter 11 proceeding or a [c]hapter 7 proceeding." As a condition of approval, I also required that such phrases as "Bankruptcy Sale" or "Final Sale Days" and "Going Out of Business" could be used only to the extent permitted by applicable nonbankruptcy law, and that phrases such as "Going Out of Business" could be used only if the debtor were operat-

ing under a confirmed plan of reorganization that called for liquidation or if the case were to be converted to chapter 7.

PSP represented that no court order or decree of any federal, state, or local government authority existed that would impair consummation of the transactions contemplated by the agreement, and that the consent of any person or entity, other than the bankruptcy court, was not required.

PSP failed to disclose, however, the existence of a permanent injunction issued by a California Superior Court barring Rosenberg and his entities (including PSP) from participating in any furniture sale commonly associated with financial hardship or distress unless the sale is conducted in full compliance with all California statutes, the California Code of Regulations, and local California ordinances and codes governing such sales.[5]

Among other things, the undisclosed injunction deals with situations in which federal bankruptcy courts authorize sales that are inconsistent with applicable statutes, regulations, or local ordinances. First, a Rosenberg entity that is authorized by a bankruptcy court to conduct such a sale is prohibited from doing so unless notice is given to the Los Angeles County District Attorney's Office. Second, compliance by Rosenberg entities with bankruptcy court orders that are inconsistent with applicable statutes, regulations, or local ordinances does not constitute a violation of the injunction.

The sale was advertised in newspapers and on prominently displayed signage as a "chapter 11 bankruptcy sale" with representations that it was "court authorized". When, at a hearing on another matter in the case, I expressed concern that the phrase "court authorized" might inappropriately lend the prestige of the court in a manner that should not be permitted, an assistant district attorney for Sacramento County entered his appearance and noted that there were also issues regarding compliance with California consumer protection laws.[6]

---

5. Final Judgment Pursuant To Stipulation As To Defendant Gene Rosenberg Associates, *People of California v. RB Furniture, Inc., et al.*, Los Angeles County Superior Court, Case No. BC055407, Sept. 9, 1992.

6. These concerns are exemplified by a July 12, 1993, newspaper advertisement: "MUST SELL. 10 DAYS ONLY! The pressure is on for the next 10 days! Orders are to raise cash! This select inventory wholesale offer ends Sunday, July

PSP and the Rosenberg organization artfully deflect objections from local authorities. They refer to the Supremacy Clause, the Bankruptcy Code, and the order authorizing the sale, insinuating that local authorities have been stripped of their ability to enforce local laws.[7]

PSP understood and expected from the outset that the sale would turn into a final liquidation. The debtor did not take any genuine steps to reorganize. Its counsel did not devote a material amount of time to preparing a plan of reorganization.

When the case was converted from chapter 11 to chapter 7 for cause, PSP asked that the sale be allowed to continue because, now that final liquidation was on the horizon, the public would "get serious" about buying. PSP's counsel explained how, consistent with the Rosenberg experience in other sales, the public was now being softened up for the final sale. Action was deferred on the request because the chapter 7 trustee needed to evaluate the situation.

The chapter 7 trustee discovered the undisclosed injunction and a hotbed of consumer protection issues and concluded that the sale was neither in compliance with state law, nor in the best interests of the estate. The trustee also concluded that the primary beneficiary of the sale was Rosenberg.

Pursuant to his discoveries, the chapter 7 trustee filed a motion to revoke the order approving the sale. He was joined by the California Attorney General. The motion was granted on an interlocutory basis, and the sale was ordered stopped pending further hearing on determination of the precise consequences of revoking the order. PSP continued to sell its own inventory at a going-out-of-business sale.

## DISCUSSION

1. *Relation of Law of the Case Doctrine to Federal Rule of Civil Procedure 60 in Bankruptcy.*

■ Preliminarily, there is a question of procedure. This movant invoked Federal Rule of Civil Procedure 60(b)[8] in seeking to revoke the order authorizing the sale, asserting that there was a fraud on the court. The opposition focused on Rule 60 standards and denied that there was a fraud on the court. Rule 60, however, does not govern the motion.

■ The imperfect fit of the Federal Rules of Civil Procedure to bankruptcy is such that this motion to revoke is better viewed as an independent "contested matter" because the order authorizing the sale was interlocutory in nature and was not entered in a separate "contested matter" under Federal Rule of Bankruptcy Procedure 9014.[9]

■ A bankruptcy court's order is interlocutory if it does not resolve and seriously

---

18th. CHAPTER 11 BANKRUPTCY. This could be your last chance ever to buy at wholesale cost! The next 10 days will rock & shock all Sacramento County! Our time is limited! WHOLESALE COST & BELOW!" Sacramento Bee, July 12, 1993, at A5.

The deadline was purely fictitious. Nothing of consequence in the case was scheduled to occur July 18. The sale itself was authorized to continue another three months and was subject to being extended.

7. When the possibility that this may have occurred was mentioned during an argument in open court, counsel for Sacramento County stepped forward to report that this was essentially what had already happened to the county. PSP made no attempt to rebut this.

8. Federal Rule of Civil Procedure 60 applies in bankruptcy with three exceptions accommodating different statutory times specified in the Bankruptcy Code. Fed.R.Bankr.P. 9024.

9. The difficulty lies in the way Federal Rule of Civil Procedure 58 is incorporated into bankruptcy cases by Federal Rule of Bankruptcy Procedure 9021. Although Rule 9021 says that adversary proceedings and contested matters must be resolved by judgments set forth in separate documents in the manner prescribed by Rule 58, the effect of its application in other contexts, including interlocutory orders, is murky. Thus, the commonly mislabeled "order" resolving a contested matter actually is a "judgment" for procedural purposes. *In re Staff Inv. Co.*, 146 B.R. 256, 262 (Bankr.E.D.Cal.1992). Subsequent adjustments to Rule 58 orders ordinarily are accomplished by applying Rule 59(e) (incorporated by Federal Rule of Bankruptcy Procedure 9023) and Rule 60 (incorporated by Federal Rule of Bankruptcy Procedure 9024). Interlocutory orders, however, are more freely revisited by courts under the "law of the case" doctrine.

affect substantive rights and does not finally resolve the discrete issue to which it is addressed. *Elliott v. Four Seasons Properties (In re Frontier Properties, Inc.)*, 979 F.2d 1358, 1363 (9th Cir.1992); *Allen v. Old Nat'l Bank of Washington (In re Allen)*, 896 F.2d 416, 418–19 (9th Cir.1990). Such was the case here.

■ The doctrine of the "law of the case" applies in bankruptcy and governs the question of whether the court may vacate an interlocutory order. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir.1990). As applied to a trial court reviewing its own orders, the doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). It is, however, a statement of "general practice" and not a limitation on the authority of the trial court. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 601–02 (9th Cir.1991).

■ Unless there has been an appellate ruling on an interlocutory appeal in the case, the law of the case doctrine functions in the trial court as a management device to promote a logical progression of litigation without endlessly rehashing the court's rulings, notwithstanding that prejudgment orders remain interlocutory and can be reconsidered at any time. 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶¶ 0.404[1] & 0.404[4.–1] (1993).

■ While respect for finality and a preference for leaving settled matters undisturbed are important values, the law of the case doctrine "does not require or encourage a trial court to render a judgment erroneous in law." *Id.* at ¶ 0.404[1]. Accordingly, a trial court retains the discretion to change its mind before a case becomes final.

■ Although some courts speak in terms of requiring a strong showing before revisiting a ruling, Mr. Justice Brennan was surely correct when he observed that the reconsideration of an interlocutory order is a matter of the trial court's "good sense". *Arizona*, 460 U.S. at 644, 103 S.Ct. at 1404. Trial judges constantly reexamine their rulings "on the basis of new information or argument, or just fresh thoughts, without excogitating a 'clear and convincing' reason for their change of heart." *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991). Accordingly, later developments in the case are an acceptable reason for a trial court to exercise its discretion to reassess earlier rulings. *Rent–A–Center*, 944 F.2d at 601–02.

■ In contrast to the flexible "good sense" standards for reconsideration permitted by the doctrine of law of the case in situations when the trial court is not hamstrung by an intervening appellate decision, relief under Rule 60(b) ordinarily requires more specific showings, which explains why the movant tried to shoehorn the facts into fraud on the court. It is not essential to conclude that there was a fraud on the court (or another Rule 60(b) cause) in order to conclude that the interlocutory order authorizing the sale should be revoked.[10]

2. *Effect of 28 U.S.C. § 959(b) on Retail Sales by Debtors.*

■ The primary question is whether a bankruptcy court may authorize a sale that is inconsistent with valid state consumer protection or deceptive trade practice laws.

The governing federal statute is section 959(b) of the Judicial Code:

(b) Except as provided in section 1166 of title 11 [relating to abandonments, mergers, and restructurings in railroad reorganizations], a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or

---

**10.** The spirit of Rule 60 is, however, inherent in the analysis of this motion.

possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b).

■■■ The constraints of section 959 [11] limit the debtor's authority to conduct business in the ordinary course and engage in the other transactions that are embodied in section 363.[12] The fact that the express reference to title 11 in the statute was added by the Bankruptcy Reform Act of 1978 precludes arguments to the contrary. Pub.L. 95–598, § 235, 95th Cong., 2d Sess. (1978).

Section 959(b) has been on the books since 1887.[13] It stands "for the uncontroversial proposition that a trustee must carry out his duties in conformity with state law." *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 593 (9th Cir.1993).

■■■ It applies in many contexts. *See, e.g., Gillis v. California*, 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934) (trustee must pay state tax); *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (*aff'g City of New York v. Quanta Resources Corp. (In re Quanta Resources Corp.)*, 739 F.2d 912 (3d Cir.1984) (environmental laws)); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579 (6th Cir.1990) (landlord's state law duties); *Saravia v. 1736 18th St., N.W., Ltd. Partnership*, 844 F.2d 823 (housing code); *Briarcliff*, 15 B.R. at 864 (rent control); *In re Synergy Dev. Corp.*, 140 B.R. 958 (Bankr.S.D.N.Y.1992) (consumer protection); *Wengert Transp., Inc. v. Crouse Cartage Co. (In re Wengert Transp. Co.)*, 59 B.R. 226 (Bankr.N.D.Iowa 1986) (certificate of public convenience and necessity).

Valid state consumer protection and deceptive trade practice laws qualify as "valid laws of the State in which such property is situat-

ed" for purposes of section 959, which applies to debtors who continue to sell goods in the retail marketplace.

Section 959(b) reflects a straightforward accommodation of competing interests by the Congress. The sphere of bankruptcy is a fundamentally financial sphere in which assets are either reduced to cash and distributed or are used to facilitate the reorganization of the debtor's financial affairs. To be sure, the Congress has provided the debtor with some potent weapons to fend off creditors. Nevertheless, the sphere is limited, as is apparent from the various exceptions to the automatic stay accommodating criminal prosecutions and most exercises of police and regulatory powers. *See, e.g.,* 11 U.S.C. § 362(b).

■■■ The purpose of bankruptcy is not to permit debtors or nondebtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business. Bankruptcy does not grant the debtor a license to eliminate the marginal cost generated by compliance with valid state laws that constrain nonbankrupt competitors.[14] The Congress has thus required that every debtor in possession and bankruptcy trustee manage and operate the debtor's property and business in compliance with state laws—good, bad, and indifferent—that apply outside of bankruptcy.

3. *Going–Out–of–Business and Financial Distress Sales.*

■■■ State consumer protection laws recognized by section 959(b) focus on liquidation and going-out-of-business sales because of the widely-understood opportunities for exploitation of the gullible.[15] The furni-

---

11. 28 U.S.C. § 959.

12. 11 U.S.C. § 363.

13. For a detailed history of the statute in its various forms, which supports the conclusion that older decisions retain vitality, see *The Briarcliff v. Briarcliff Tenant's Assn. (In re The Briarcliff)*, 15 B.R. 864, 866–67 (D.N.J.1981).

14. Complying with consumer protection laws is not costless and, even though it is difficult to quantify, it constitutes an economic cost that applies to each sale, thus making it a component of the retailer's total marginal cost.

15. No view is herein intimated about the policy question of whether such laws are efficacious. The salient point is that so long as such laws are valid and enforceable, they must be obeyed in bankruptcy except where plainly preempted by the Bankruptcy Code and implementing rules.

ture industry, in particular, has been singled out for special attention.

■ Such phrases as "financial distress" or "going out of business" create consumer expectations about how long the sale will last and the nature of the bargains to be expected. Those expectations are easily exploited by merchants who are not really going out of business, who are not really financially distressed, or who are running the sale for an extended period. Thus, consumer protection and deceptive trade practice laws forbid misleading uses of such terms.

The California consumer protection and deceptive trade practice laws that apply in this instance are typical of many laws in many states.[16] False and misleading statements in advertising are prohibited generally. Cal.Bus. & Prof.Code § 17500 (West 1993). And such statements are prohibited in the home furnishings business specifically. *Id.* at § 19150. Detailed regulations implement these statutes. Cal.Code Regs. tit. iv, art. 10, § 1300, et seq. (1993). Some California localities also have pertinent ordinances.

■ The introduction of new merchandise at financial distress sales is a suspect practice. In California, it is forbidden.[17]

Similarly, "special" sales, including liquidation sales, inventory sales, and overstock sales, must exclude new inventory.[18] Here, approximately 70 percent of the furniture was new inventory brought in by PSP.

There is little doubt that the sale in question offended sections 1305 and 1312 of the California regulations for furniture sales.

4. *Bankruptcy as a Distress Sale.*

■ Bankruptcy presents a classic distress scenario. Mere use of the word "bankruptcy" conveys essentially the same message as "financial distress" or "going out of business". The consumer has a sense of urgency and expects lower prices and greater bargaining power.

■ The genuine liquidation bankruptcy sale ordinarily poses no problem under consumer protection and deceptive trade practice laws because nobody is misled. Consumers' expectations comport with reality. But, when the bankruptcy sale is well-financed and extends over a prolonged period, it does have the capacity to mislead. At that juncture, state consumer protection laws become significant.

---

16. *See, e.g.,* Fla.Stat.Ann. § 559.20 (West 1992); Ga.Code Ann. § 10–1–392 (Michie 1993); Ind. Code Ann. § 25–18–1–1 (Burns 1993); La.Rev. Stat.Ann. § 51:411 (West 1994); Mass.Gen.Laws Ann. ch. 93, § 28A (West 1993); N.Y.Gen.Bus. Law § 581 (McKinney 1994).

17. The provision in the California Code of Regulations relating to furniture store liquidation sales is:

§ 1312. Liquidation. No advertisement shall represent or imply, by means of the term "Going Out of Business," "Selling Out," "Closing Out," "Liquidating," or any term of similar import, that the advertiser is going out of business, or is disposing of all or a portion of a stock of merchandise, unless such representation is true and is not in any respect misleading as to the advertiser's discontinuing business or as to the types and quantity of merchandise intended to be included, and unless the articles offered for sale, and to be sold, during the sale are restricted to those articles on the premises or in transit from previous orders the date the sale is announced. A mere change of business location, business name or type of business entity does not constitute going out of business within the meaning of this section.

Cal.Code Regs. tit. iv (Business Regulations), div. 3 (Bureau of Home Furnishings), art. 10 (False or Misleading Advertising), § 1312 (1993).

18. The California regulation addressing other special furniture sales is:

§ 1305. Special Sale. No advertisement shall represent that because of an unusual business event in the course of business or unusual manner of doing business or for any other reason an article is offered for sale at a savings in price unless such advertisement is in all respects true and not misleading. If an advertisement represents that the sale is being held for reasons relating to transactions which have already occurred or orders which have already been placed, the articles offered at sale prices are restricted to those articles on the premises, in the warehouse or in process from previous orders the date the sale is announced. Sales of this type include, but are not limited to, LIQUIDATION sales, inventory sales and overstock sales.

Cal.Code Regs. tit. iv (Business Regulations), div. 3 (Bureau of Home Furnishings), art. 10 (False or Misleading Advertising), § 1310 (1993).

The problem is illustrated by the instant situation. The advertising created the impression that there were deadlines that compelled the merchant to accept low offers. For example, the July 12, 1993, advertisement invoked a July 18 deadline, saying: "This could be your last chance ever to buy at wholesale cost! ... Our time is limited! WHOLESALE COST AND BELOW!" [19] That deadline was purely artificial. The sale was authorized to continue for three more months and was extendable by agreement. The prices were higher than what PSP expected to get at the final going-out-of-business sale which it knew was inevitable once the debtor's "breathing room" in chapter 11 expired.

When the case was later converted to chapter 7, PSP admitted what it had been stringing the public along. It pleaded for permission to run an immediate going-out-of-business sale, confessing that the sales in preceding months were just part of the process of softening up the public for the final sale.

### 5. Effect of Bankruptcy Court Order Authorizing the Sale.

Part of the Rosenberg strategy is to prevail upon the bankruptcy court to sign an order approving the sale. Armed with such an order, they have more ammunition for jawboning with enforcement authorities.

■ The request for such an order ordinarily appears innocuous enough at first glance. It is billed as the debtor's best opportunity to raise capital to fund a chapter 11 plan. Creditors support it because there is a chance of more money for them.[20] Nobody mentions the consumer protection issues or gives notice to enforcement authorities.

■ Although it is all too easy to approve uncontested orders, courts should be alert to the possibility that a party might use an order for an inappropriate purpose.

### a. Inappropriate Invocation of Prestige of Court in Advertising.

■ A judge's order approving a transaction cloaks the transaction with the prestige of the court. After such a cachet is conferred, it is susceptible of abuse.

"Court-authorized Bankruptcy Sale" in letters several feet high was emblazoned on the side of White Crane's building in plain view of a busy freeway. This was troublesome. Inside the building, a merchant was retailing furniture in a continuing business.

The language "court authorized" can convey a misimpression in consumers' minds that a court is supervising the activities within the store. This tends to lull consumers into a sense of security that they will not be cheated and that, if they are, the court will protect them from loss by ordinary restitution.

■ Permitting a merchant to trumpet court authorization amounts to entrusting the court's prestige to the care and custody of the merchant. It places that prestige at risk of being sullied by the actions of others. What if the merchandise is shoddy? Breaches of warranty? Dubious credit practices? "Bait and switch" tactics?

■ When a court recognizes that its name is being used in vain, it has an obligation to intervene sua sponte. Cf. Code of Judicial Conduct for United States Judges, Canon 2B (1992).[21] Within several days after first seeing the sign on White Crane's building, I raised the issue in open court during a routine hearing in the case and suggested that the parties needed to persuade me that there was no problem. They elected, instead, to stop making references to court authorization.

That does not, however, justify misleading the consuming public and violating section 959(b).

---

19. *Supra* Note 5.

20. The fact that no creditor objected to the proposed sale is immaterial. The sale of indefinite duration with new inventory being introduced at advantageous intervals in violation of applicable law gave unsecured creditors a better chance of recovering more than in a straight liquidation.

21. "... a judge shall not lend the prestige of the judicial office to advance the private interests of * * * others; ..."

### b. *Misrepresentation of the Order to Enforcement Authorities.*

It is also troubling that Rosenberg misrepresents the order to state and local enforcement authorities by suggesting that the order preempts consumer protection laws. The problem is that courts seldom consider such issues in connection with the order.

It is plain that the ploy was attempted in this case. Although state enforcement authorities have standing to seek clarification from the court regarding consumer protection and deceptive trade practice issues, the paucity of decisions on the subject suggests that they rarely do so. Here, there was the uncommon circumstance of a subsequently-appointed chapter 7 trustee who took a hard-nosed look at the situation and sought to revoke the order.[22]

The California Attorney General was allowed to join in the trustee's motion because a state attorney general has independent standing to bring such a motion.

### c. *Attempts to Circumvent Section 959(b).*

 The Rosenberg strategy is to finesse section 959(b) and state consumer protection laws. Since section 959(b) admits no exceptions, the court cannot carve out an exemption from state law. A party should never present a court with a proposed order that would authorize the impermissible.

 Some consumer protection laws, however, recognize an exception for sales that are authorized by courts. Thus, the requested order can make a difference and can serve to cure an otherwise doubtful transaction. The applicant for such an order, however, must be candid with the court and must unambiguously reveal that the sale that is being authorized would be troublesome under state law absent judicial imprimatur. If a proposed order would permit a merchant to operate outside the normal bounds of state law by virtue of the order alone, the court must be informed so that it may make a knowing and intelligent decision. Moreover, failure to give enforcement authorities notice hampers the court's ability to decide.

### d. *Good Faith under 11 U.S.C. §§ 363(m) and 364(e).*

 The proposed Rosenberg scheme also purported to authorize a sale out of the ordinary course of business and to extend credit secured by the debtor's inventory.[23] This implicates the benefits and requirements of two sections of the Bankruptcy Code—11 U.S.C. §§ 363 and 364.[24]

Those who act in good faith pursuant to a court order under sections 363 or 364 are insulated from the effects of reversal on appeal. 11 U.S.C. §§ 363(m) & 364(e). In each instance, good faith is a prerequisite.

 Parties lack the requisite good faith when they fail to reveal ulterior motives that may affect the court's reasoning. Parties similarly lack good faith when they fail to reveal material facts.

---

**22.** The seeds of Rosenberg's troubles in this case were sown by the proposed provision that appeared to preempt otherwise applicable state law. The court's refusal to approve an order with such a provision in light of section 959(b) forced Rosenberg to make questionable representations to the court, thereby arousing the trustee's suspicions.

**23.** The economic substance of the transaction with the debtor called for PSP to purchase all of the debtor's furniture for the amount allegedly loaned to the debtor and carry out the sale as if it had purchased all of the debtor's furniture. In the instant case, the total funds allegedly advanced as loans to the debtor were substantially less than the value of the furniture at the debtor's cost.

**24.** Although the insulation is provided only for appeals rather than situations in which the trial court revisits the matter, the principle remains applicable and ought, in fairness, to be considered by the trial court.