In re The GREATER SOUTHEAST COMMUNITY HOSPITAL FOUNDA-TION, INC., et al. (members of the Greater Southeast Healthcare System), Debtors.

Bankruptcy No. 99–01159.

United States Bankruptcy Court, District of Columbia.

Aug. 20, 1999.

David E. Rice, Venable, Baetjer & Howard, Baltimore, MD, for debtor.

Robert D. Perrow, Richmond, VA, for the Bank of New York ("Indenture Trustee").

Peter D. Isakoff, Weil, Gotshal & Manges LLP, Washington, DC, for Daiwa Healthco–3 LLC.

## DECISION RE EFFECT OF § 551

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The issue before the court is whether 11 U.S.C. § 551 applies when the debtor, pri-

or to the commencement of its bankruptcy case, has sold property that is subject to an avoided lien. The court concludes that § 551 does apply.[1]

## FACTS

In these jointly administered cases, Greater Southeast Community Hospital Corporation, Inc., is one of the four debtors, and that entity is referred to as "the debtor" for the purposes of this decision.[2]

Pursuant to 11 U.S.C. § 544, the debtor has obtained an order avoiding a lien the debtor had granted post-petition to an indenture trustee against the debtor's accounts receivable. But Daiwa Healthco–3 LLC asserts that the debtor sold some of the receivables to it before the petition date and contends, on this basis, that § 551 does not apply.

*The Relationship Between the Debtor and the Bank of New York as Indenture Trustee*

The Bank of New York ("Indenture Trustee") is the successor Master Trustee to NationsBank of Maryland, N.A., under a Master Trust Indenture dated April 21, 1993. Pursuant to the Master Trust Indenture, on April 21, 1993, the debtor and the other "Obligated Group Members"[3] granted NationsBank of Maryland, N.A., a security interest in, among other things, all of the debtor's "Receipts."[4]

1. This decision supplants the court's earlier oral decision on the § 551 issue.

2. The "Greater Southeast Healthcare System" is comprised of several not-for-profit and for-profit companies operated by Greater Southeast Community Hospital Foundation, Inc. ("the Foundation"). The heart of the system's operations is the debtor's Greater Southeast Community Hospital, which is the only full-service hospital in the District of Columbia located east of the Anacostia River.

On May 27, 1999, the Foundation and three of its affiliated entities (the debtor; Greater Southeast Management Company; and Fort Washington Nursing Home, Inc.) filed chap-

ter 11 petitions. Pursuant to an order entered July 1, 1999, the four bankruptcy cases have been jointly administered.

3. Each of the four aforementioned debtors (along with other affiliated entities) is an Obligated Group Member, under Section 3.02 of the Master Trust Indenture.

4. The Master Trust Indenture defines "Receipts" as

all receipts, revenues, rentals, income, insurance proceeds and other moneys received by or on behalf of any Obligated Group Member, including (without limitation) revenues derived from (i) the ownership, operation or leasing of any Group

■ As a debtor-in-possession (11 U.S.C. § 1101(1)), the debtor is cloaked with the avoidance powers of a bankruptcy trustee. 11 U.S.C. § 1107(a). The debtor brought an adversary proceeding against the Indenture Trustee under the avoidance powers embodied in 11 U.S.C. § 544. The court entered a stipulated order reciting that there was no evidence of a financing statement having been filed with the Recorder of Deeds for the District of Columbia in favor of NationsBank of Maryland, N.A., or in favor of the Indenture Trustee, with respect to the Receipts of the debtor or any other Obligated Group Member. On that ground, the stipulated order avoided the security interest of the Indenture Trustee in the Receipts of the debtor under 11 U.S.C. § 544,[5] to the extent that such interest had to have been perfected by the filing of a financing statement (the filing of which would be required as to accounts receivable and proceeds). The stipulated order also preserved the Indenture Trustee's security interest for the benefit of the estate, pursuant to § 551. Finally, the stipulated order preserved the Indenture Trustee's lien status as to competing creditors.

> Facilities and all rights to receive the same, whether in the form of accounts receivable, contract rights, general intangibles or other rights, and the proceeds of such rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (ii) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet any of the obligations of any Obligated Group Member incurred in the financing, operation, maintenance or repair of any of the Group Facilities.

5. The stipulated order does not specify which subsection of § 544 served as the basis for the avoidance. The court notes that § 544(a)(1) would do the trick, for it provides:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

*The Relationship Between the Debtor and Daiwa*

The debtor and Daiwa Healthco–2 LLC entered into what was entitled a "Healthcare Receivables Purchase Agreement" ("Purchase Agreement") on March 31, 1997.[6] Subsequently, Daiwa Healthco–2 LLC assigned its interest in the agreement to Daiwa Healthco–3 LLC. The court will refer to both entities as "Daiwa." Under the Purchase Agreement, Daiwa agreed to purchase the debtor's "Designated Receivables."[7] In prosecuting a motion to authorize use of the receivables, the debtor asserts that Daiwa's interest in the receivables is junior to the Indenture Trustee's lien and that § 551 preserves the latter lien for the benefit of the estate.[8]

## ANALYSIS

### I

### Introduction

This decision concerns the interpretation of 11 U.S.C. § 551 (entitled "Automatic preservation of avoided transfer"), which

> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

6. For the purposes of this decision, the court assumes, without deciding, that Daiwa is a purchaser of the accounts receivable covered by the Purchase Agreement. The parties opposing Daiwa hotly contend that there was no sale, instead asserting that Daiwa was only granted a security interest.

7. The Designated Receivables were portions of the debtor's accounts for medical and diagnostic services rendered to patients that are reimbursable by third-party payors (such as health insurance carriers) and government payors under the Medicare and Medicaid programs.

8. Whether Daiwa's interest is junior to the Indenture Trustee's lien awaits resolution of other issues.

states that "[a]ny transfer avoided under section ... 544 ... of this title ... is preserved for the benefit of the estate but only with respect to property of the estate."

Daiwa claims that it is a purchaser of the debtor's accounts receivable and that this pre-petition purchase of the accounts receivable removes them from the estate such that § 551 cannot be brought to bear. The court rejects Daiwa's interpretation. The Bankruptcy Code, when reviewed in its entirety, plainly provides that § 551's exception applies to such avoided liens in property sold by the debtor pre-petition. Even if the statute were ambiguous, Daiwa's interpretation would undo clear bankruptcy policy that had been reflected in the Bankruptcy Act, in favor of allowing an avoided lien to be preserved for the benefit of the estate, even if the property was sold pre-petition by the debtor after the lien had been granted. Finally, any ambiguity in the statute would be resolved against Daiwa's interpretation by the legislative history to the statute.

## II

### The Interaction of §§ 541, 544, 550, and 551

The Bankruptcy Code contemplates that when a lien is granted, there has been a transfer of property. 11 U.S.C. § 101(54) defines the term "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equi-

ty of redemption." The term "lien" is defined in § 101(37) as a "charge against or interest in property to secure payment of a debt or performance of an obligation." Moreover, § 547(c)(3)[9] provides an exception for the granting of certain security interests in property of the debtor from the reach of the trustee's avoidance power of § 547(b), which in turn applies only to a "transfer of an interest of the debtor in property." This is strong proof that the granting of a lien is treated by the Code as a "transfer of an interest of the debtor in property," because the § 547(c)(3) exception would otherwise be unnecessary. *See Rake v. Wade*, 508 U.S. 464, 474–75, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (if terminology in one section did not reach as far as Court held, then an exception contained in another section employing the same terminology would have been unnecessary); *Cohen v. De La Cruz*, 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (noting the "presumption that equivalent words have equivalent meaning when repeated in the same statute"). The transfer to the Indenture Trustee of the security interest in the debtor's accounts receivable is to be treated as a "transfer of property of the debtor."

With this backdrop, the court moves to § 544, which is the provision under which the Indenture Trustee's lien was avoided. Section 544(a) provides that "[t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor"; it then goes on to state when the transfers are avoidable

---

9. Section 547(c)(3) reads:
 (c) The trustee may not avoid under this section a transfer—
 ....
 (3) that creates a security interest in property acquired by the debtor—
 (A) to the extent such security interest secures new value that was—
 (i) given at or after the signing of a security agreement that contains a description of such property as collateral;

 (ii) given by or on behalf of the secured party under such agreement;
 (iii) given to enable the debtor to acquire such property; and
 (iv) in fact used by the debtor to acquire such property; and
 (B) that is perfected on or before 20 days after the debtor receives possession of such property.

by the trustee. The case law is well established that this provision may be used to avoid unperfected security interests.

Section 550(a) then provides that "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... the trustee may recover, for the benefit of the estate, the property transferred." In other words, the trustee in a lien avoidance case recovers the property that was transferred—the interest in the property conveyed to effect the creation of a lien. *See Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1419 (5th Cir.1997) (illustrating that the avoidance of a lien is treated as resulting in a recovery of property under § 550(a)). As under the Bankruptcy Act, the Bankruptcy Code contemplates that the property subjected to a lien that had been avoided "shall be reckoned as a part of [the] estate." *Fist Nat'l Bank of Baltimore v. Staake*, 202 U.S. 141, 149, 26 S.Ct. 580, 50 L.Ed. 967 (1906) (discussed at length in part IV, below). Section 541(a)(3) expressly provides that "[a]ny interest in property that the trustee recovers under section ... 550 ... of this title" is property of the estate.

In contrast, Daiwa argues that § 541(a)(4) is the provision specifically covering liens that are avoided and then become property of the estate.[10] But Daiwa's argument loses sight of the distinction between the property that was transferred to the superior creditor (in order for that creditor to have its lien) as opposed to the lien itself. There is a distinction, and that distinction is important. The property comes back into the estate under § 550, albeit free of the avoided lien.

Of course, the property is not worth anything to the estate if there is a prepetition deed of conveyance outstanding that would take precedence over the § 550 post-petition interest in the property recovered by the trustee. Only if the avoid-

ed senior lien itself were somehow preserved for the benefit of the estate—and thus available to assert against the holder of the pre-petition conveyance—would the recovery of the property be of any benefit to the estate.

The avoided lien itself is not brought back into the estate under § 550, but only the property transferred to effect the creation of the lien. To answer the question of whether the property recovered by the trustee (or the debtor-in-possession acting with the powers of a trustee) would have any benefit for the estate, the court turns to § 551 of the Bankruptcy Code, which deals with the distinct question of whether the lien itself may be preserved for the benefit of the estate.

Under § 551, the lien is preserved for the benefit of the estate, "but only with respect to property of the estate." The phrase "only with respect to property of the estate" is satisfied in this case because the property has been recovered for the benefit of the estate. Thus, when a lien is granted, the Bankruptcy Code treats the transaction as a transfer of property to create the lien. Concepts akin to the title theory of mortgages come into play; it is as though the debtor is making a conveyance of ownership of the property to the lien creditor for the purpose of the lien creditor getting a lien on the property. Section 550 pulls that property back into the estate. Then § 551 preserves the lien for the benefit of the estate.

The lien avoided is preserved *only* with respect to such property of the estate. For example, suppose there were a federal tax lien for nondischargeable taxes. Such a lien attaches to all property and rights to property of the debtor, wherever located, whether acquired pre- or post-petition. In that case, if the estate took over the entire tax lien, the estate would be able to chase after property that the debtor had ob-

---

**10.** Section 541(a)(4) provides, "Any interest in property preserved for the benefit of or ordered transferred to the estate under sec- tion 510(c) or 551 of this title" is property of the estate.

tained post-petition and to act as a collection agent on behalf of the tax creditor, with respect to collecting from post-petition assets. But that is precisely what Congress was trying to say should not occur; instead, the estate should be limited to dealing with preservation of the lien with respect to property of the estate.

 Importantly, the preservation of the lien is automatic under § 551. So simultaneously with the recovery of the property under § 550, the lien is preserved. If there has been a pre-petition sale of the property, that sale is ineffective to prevent the lien from being preserved. As of the petition date, the sale prevented the property from being property of the estate under 11 U.S.C. § 541(a)(1). But upon a § 550 recovery into the estate of the avoided transfer of property to the senior lienor, and a simultaneous § 551 preservation of that lien for the benefit of the estate, the sale's effectiveness must yield to the superiority of the preserved senior lien.

However, the § 550 recovered transfer of property to the lienor and the simultaneous § 551 preservation of the lien is worthless to the estate if the lien was unperfected vis-a-vis the sale. In that event, the § 550 transfer pulled back into the estate must yield to the sale transfer, which trumps the unperfected lien. The sale is effective against the post-petition recovery into the estate of the unperfected interest the lienor had in the property.

The court believes that its interpretation of § 551 is justified despite the decisions cited by Daiwa as having interpreted the statute differently. *See In re Ward,* 42 B.R. 946 (Bankr.M.D.Tenn.1984); *Barber v. Princeville State Bank (In re Ostrom–Martin, Inc.),* 161 B.R. 800 (Bankr.C.D.Ill. 1993). Those decisions did not address the effect of § 550 on the analysis of the interpretation of § 551; therefore, they are of no persuasive power with respect to this court's analysis of the provision. Nor is the court convinced by the case cited by the debtor, *Hulk v. Rosenbaum (In re*

*Hulk),* 8 B.R. 444 (Bankr.D.Conn.1981). That court's conclusory discussion of § 551 overlooked the complementary and interlocking nature of §§ 550 and 551, which is the cornerstone for the court's ruling today.

### III

*The Court Need Not Consider Legislative History or Pre–Code Practice*

The court's interpretation of the statute is consistent with numerous Supreme Court decisions dealing with the proper interpretation of the Bankruptcy Code and with statutory interpretation in general. *See generally* Walter A. Effross, *Grammarians at the Gate: The Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence,* 23 Seton Hall L.Rev. 1636 (1993).

For example, in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court interpreted the meaning of § 506(b) of the Bankruptcy Code. In doing so, the Court began "where all such inquiries must begin: with the language of the statute itself." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. 1026. The Court observed the plain meaning of legislation to be conclusive except "in the rare cases [in which] the literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair,* 489 U.S. at 242, 109 S.Ct. 1026 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).

Nevertheless, the Court then addressed when seemingly plain language can give way to the policy considerations inherent in the Bankruptcy Code. It pointed to two decisions—*Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); and *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)—in which the Court had given

weight to pre-Code practice in interpreting Bankruptcy Code provisions. The Court noted that in those two cases, "pre-Code practice was significant because it reflected policy considerations of great longevity and importance." *Ron Pair*, 489 U.S. at 245, 109 S.Ct. 1026. Further, the Court said that "*Kelly* and *Midlantic* make clear that, in an appropriate case, a court must determine whether Congress has expressed an intent to change the interpretation of a judicially created concept in enacting the Code.... *Both decisions concerned statutory language which, at least to some degree, was open to interpretation.*" *Id.* (emphasis added). Conversely, the provision in question in *Ron Pair* contained no ambiguity. So the Court concluded that its "natural interpretation of the statutory language does not conflict with any significant state or federal interest, nor with any other aspect of the Code," *id.*, and, accordingly, held that the plain language of § 506(d) controlled.[11]

■ For guidance, the court also looks to *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), in which the Supreme Court found an ambiguity in the language of § 506(d) of the Bankruptcy Code regarding the proper treatment of liens in bankruptcy. *Dewsnup* raised issues concerning a fundamental bankruptcy policy—the rule reflected in longstanding case law that liens survive a chapter 7 bankruptcy case. Seizing upon what it viewed as a textual ambiguity, the Court observed that it was "not convinced that Congress intended to depart from the pre-Code rule that liens pass through bank-

ruptcy unaffected." *Dewsnup*, 502 U.S. at 417, 112 S.Ct. 773. However plausible the majority in *Dewsnup* may have been in finding an ambiguity in the statute at issue there, Daiwa's arguments here present no plausible basis for finding an ambiguity.[12] Just because other courts and litigants have overlooked the plain effect of § 550 on the application of § 551 does not create an ambiguity.

■ In reading the Bankruptcy Code as a whole, the court fails to see any ambiguity in the role played by § 551. The court's recitation of the analysis of §§ 541(a)(3), 544, and 550 demonstrates that it is dealing with specific language that is part of—and consistent with—the Bankruptcy Code's statutory scheme. The plain reading of this unambiguous statute does not produce an absurd result, nor "does [it] conflict with any significant state or federal interest, nor with any other aspect of the Code." *Ron Pair*, 489 U.S. at 245, 109 S.Ct. 1026. In fact, the court's plain reading is the only reading that "produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

■ When interpreting a plainly written statute, the text should trump the use of pre-Code practice. "[W]hether pre-Code practice is retained or abandoned, the text means precisely what it says." *Dewsnup*, 502 U.S. at 434, 112 S.Ct. 773 (Scalia, J., dissenting); *cf. id.* at 419–20,

---

11. While the Court in *Ron Pair* noted that the result in that case was "arguably somewhat in tension with the desirability of paying all creditors as uniformly as practicable," *Ron Pair*, 489 U.S. at 245–46, 109 S.Ct. 1026, the Court nevertheless abided by the statute's plain language. In contrast, the result in the instant case creates no conflict with bankruptcy policies, thus making this court's task of abiding by the provisions's plain language painless.

12. Relying on the "contrasting positions of the respective parties and their amici,"

*Dewsnup*, 502 U.S. at 416, 112 S.Ct. 773, the *Dewsnup* majority determined the statute to be ambiguous. A scathing dissent took the position that the mere existence of a "subject of disagreement between self-interested litigants," *id.* at 423, 112 S.Ct. 773 (Scalia, J. dissenting), does not create a presumption that a statutory provision is ambiguous. Instead, the dissent urged that a court should apply its own "textual and structural analysis," *id.* at 435, 112 S.Ct. 773 (Scalia, J., dissenting), to determine whether an ambiguity actually exists.

112 S.Ct. 773 (stating that "where the language is unambiguous, silence in the legislative history cannot be controlling").[13] Finally, where Congress' clear desire to change pre-Code practice is reflected in the Code's language, the Court should "simply enforce[ ] the new Code according to its terms, without insisting upon at least some discussion [of the change from prior law] in the legislative history." *Id.* at 433, 112 S.Ct. 773 (Scalia, J., dissenting) (internal quotation and citation omitted). Presumably the same rule applies when Congress' clear desire to continue pre-Code practice is reflected in the Code's language. Consequently, the plain meaning of the statute should be dispositive, and the court need not resort to examining pre-Code practice and the legislative history.

## IV

### *Staake and Bankruptcy Policy*

Even if the Bankruptcy Code, taken as a whole, were ambiguous the interpretation Daiwa urges would have to be rejected as causing anomalous results Congress would not likely have intended. First, Daiwa's interpretation would cause an unwarranted windfall to Daiwa as purchaser: Daiwa would no longer have to contend with the avoided lien of the Indenture Trustee, a result that would not occur outside bankruptcy.[14] This is an absurd result Congress would not likely have intended. Second, Daiwa's interpretation would be an open invitation to abuse. Any debtor wishing to make a transfer that would otherwise be avoidable could simply transfer a lien for, say, 90 percent of the value of the property. Then the debtor could sell the residual 10 percent value to a third party for the full value of that 10 percent, thereby immunizing the lien from being

preserved under § 551, and thereby discouraging any attempt by a trustee to avoid the transfer under the relevant avoidance provision. So between the two possible interpretations, assuming the statute were ambiguous, courts should opt for the interpretation that § 551 applies even after a sale. Indeed, the case that Daiwa principally relies upon, *Waldschmidt*, 42 B.R. at 946, convincingly lays out the arguments in favor of holding § 551 applicable to purchasers if the statute were ambiguous.

 Moreover, if § 551 were ambiguous, it ought to be interpreted in a way that preserves the result in *Staake* instead of completely abandoning that result. Courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 563, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Cohen v. De La Cruz,* 523 U.S. at 219–20, 118 S.Ct. 1212. And, if pre-Code practice were not dispositive, the legislative history demonstrates that Congress designed § 551 to make the preservation automatic for the benefit of the estate, thereby strengthening pre-Code practice. Moreover, Daiwa's interpretation would be defeated by a review of how the issue addressed was handled under pre-Code law and how the legislative history views the statute. Resort to those extra-statutory sources of interpretation is unnecessary, however, because the statute itself is plainly written.

In *First National Bank of Baltimore v. Staake,* 202 U.S. 141, 26 S.Ct. 580, 50 L.Ed. 967 (1906), the Supreme Court interpreted § 67f of the Bankruptcy Act, which provided

---

13. The disagreement in *Dewsnup* did not go to these observations; had the majority agreed with the dissent's view that the statute was unambiguous, the majority presumably would have agreed with these observations.

14. If the debtor-in-possession had elected not to avoid the lien under § 544 because the lien itself could not be preserved under § 551, then the Indenture Trustee would have the windfall of its lien not being avoided even though § 544 clearly embodied a policy in favor of avoidance.

[t]hat all ... liens obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of a petition in bankruptcy against him, shall be deemed null and void in case he is adjudged a bankrupt, and the property affected by the ... lien shall be deemed wholly discharged and released from the same, and shall pass to the trustee as a part of the estate of the bankrupt, unless the court shall ... order that the right under such ... lien shall be preserved for the benefit of the estate; and thereupon the same may pass to and shall be preserved by the trustee for the benefit of the estate as aforesaid.

In *Staake,* the Court dealt with the precise situation that this court faces—namely, an avoided lien. Here, the stipulated order in the adversary proceeding avoided the Indenture Trustee's lien. But the property on which the lien rested has been conveyed by the debtor prior to the commencement of the bankruptcy case. Daiwa maintains that the papers pursuant to which it obtained an interest in the debtor's accounts receivable had constituted a sale such that the property was no longer owned by the debtor upon the commencement of the bankruptcy case.

The Court in *Staake* held that despite the arguments by the purchaser of the property, the trustee was permitted to have the lien preserved for the benefit of the estate. In so ruling, the Court specifically rejected the argument "that the bankruptcy court has nothing to do with the property, since it really did not belong to the bankrupt." *Staake,* 202 U.S. at 147, 26 S.Ct. 580. Rather, the Court remarked:

Section 67f is merely carrying out the general purposes of the act, of securing to the creditors the entire property of the bankrupt, reckoning as part of such property liens obtained by attaching creditors against real estate which had been transferred to another, though no deed had been actually executed and recorded.

*Id.* at 148, 26 S.Ct. 580. The Court continued, "The liens acquired in this case were liens upon property which, as to attaching creditors, was the property of the bankrupt, and Congress may lawfully insist that it shall be reckoned as a part of his estate, and pass to the trustee." *Id.* at 149, 26 S.Ct. 580.

The policy that the Court adopted in reaching this interpretation of the statute rested upon the most elemental of bankruptcy principles—equality amongst creditors.[15] The Court noted:

If the interest of [the debtor] in this property were sold solely for the benefit of the attaching creditors, it would obviously result in a preference to those creditors over the general creditors of his estate, and in fraud of the bankruptcy act, which is designed to secure equality among all creditors.

*Id.*

It is difficult to believe that Congress would have renounced the result that had been accomplished in *Staake* without some word as to why it deemed it appropriate to abandon this statutory provision embodying a fundamental principle of bankruptcy law. The legislative history of § 551 makes no mention of any intention to overrule *Staake* and to eschew the effect of § 67f of the Bankruptcy Act. To the contrary, the legislative history indicates that Congress intended § 551 to strengthen the impact of § 67f of the Bankruptcy Act by making the preservation automatic for the

---

**15.** This principle of equality was at stake because the avoided transfer was a preference. The preference avoidance powers of a trustee are now embodied in 11 U.S.C. § 547, as in the case of § 544, a transfer avoided under § 547 is recovered into the estate under § 550 and if the transfer involved the creation of a lien, that lien is preserved under § 551. Although this case involves § 544, the interpretation Daiwa urges would extend to the § 547 avoidance powers as well and be at odds with the principle of equality of distribution amongst creditors manifested by § 547.

benefit of the estate. Indeed, the legislative history explains that the clause "only with respect to property of the estate" was intended to "prevent[ ] the trustee from asserting an avoided tax lien against after acquired property of the debtor." *C & C Co. v. Seattle First Nat'l Bank (In re Coal–X Ltd. "76")*, 60 B.R. 907, 911 (Bankr.D.Utah 1986) (quoting 124 Cong. Rec. S17,414 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini); 124 Cong. Rec. H11,097 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards)). Further, both congressional reports explain that § 551 "as a whole prevents junior lienors from improving their position at the expense of the estate when a senior lien is avoided." *Id.* (quoting S.Rep. No. 95–989, at 91 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5877; H.R.Rep. No. 95–595, at 376 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6332).

## CONCLUSION

Using either (1) the statutory language of § 551 read in conjunction with § 550 or (2) pre-Code practice and legislative history leads to identical results. No contradiction arises between the two options. Ambiguity or no ambiguity in the statute, the result in *Staake* is preserved. Accordingly, the court concludes that assuming there was a pre-petition sale of accounts receivable to Daiwa, the debtor's rights under § 551 apply and the avoided lien is preserved for the benefit of the estate upon those accounts receivable.